**[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 171.]**

FRED SIEGEL CO., L.P.A. ET AL., APPELLEES, *v.* ARTER & HADDEN ET AL., APPELLANTS.

[Cite as *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 1999-Ohio-260.]

*Torts—Elements of tortious interference with contract—Establishing lack of justification element in tort of tortious interference with contract—Factors in determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another—Establishment of privilege of fair competition will defeat claim of tortious interference with contract, when—Listings of names, addresses, or telephone numbers that have not been published or disseminated constitute trade secrets, when—Whether particular knowledge or process is a trade secret is a question of fact determined by trier of fact upon greater weight of the evidence.*

(No. 97-1998—Submitted September 29, 1998—Decided April 7, 1999.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 71440.

1.  The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. (*Kenty v. Transamerica Premium Ins. Co.* [1995], 72 Ohio St.3d 415, 650 N.E.2d 863, paragraph two of the syllabus, affirmed and followed.)

2.  Establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper. (*Kenty v. Transamerica Premium Ins. Co.* [1995], 72 Ohio St.3d 415, 650 N.E.2d 863, affirmed and followed.)

3.   In determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. (Restatement of the Law 2d, Torts [1979], Section 767, adopted.)

4.   Establishment of the privilege of fair competition, as set forth in Section 768 of the Restatement, will defeat a claim of tortious interference with contract where the contract is terminable at will. (Restatement of the Law 2d, Torts [1979], Section 768, adopted.)

5.   Pursuant to former R.C. 1333.51(A)(3), listings of names, addresses, or telephone numbers that have not been published or disseminated, or otherwise become a matter of general public knowledge, constitute trade secrets if the owner of the list has taken reasonable precautions to protect the secrecy of the listing to prevent it from being made available to persons other than those selected by the owner to have access to it in furtherance of the owner's purposes.

6.   The question whether a particular knowledge or process is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence. (*Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.* [1986], 24 Ohio St.3d 41, 24 OBR 83, 492 N.E.2d 814, affirmed and followed.)

_____

{¶ 1} Fred Siegel Co., L.P.A., and Fred Siegel (collectively, "Siegel") initiated this action by filing a complaint naming as defendants attorney Karen H. Bauernschmidt and the law firm of Arter & Hadden.  Fred Siegel alleged that he was

a principal of the licensed professional association Fred Siegel Co., L.P.A., and that defendant Bauernschmidt had been employed by Siegel until September 23, 1992, when she resigned to join Arter & Hadden. The complaint alleged tort liability based on theories of tortious interference with contract, misappropriation of trade secrets, and breach of fiduciary duty.

{¶ 2} The defendants denied liability.

{¶ 3} During discovery it was established that Bauernschmidt had worked for the Siegel law firm for ten years as an associate attorney. During that period, Bauernschmidt provided legal counsel to Siegel clients in regard to valuation of property and assessment of real property tax, and had represented them in county boards of revision, the Ohio Board of Tax Appeals, and in the courts. During her employment with Siegel, Bauernschmidt had direct and frequent contact with Siegel clients and had developed personal relationships with many of them. Bauernschmidt conceded in deposition testimony, however, that the clients for whom she worked while an associate were clients of Siegel.

{¶ 4} As an associate at the Siegel law firm, Bauernschmidt had full access to client files, as well as access to information regarding the identity and addresses of Siegel clients and contact persons, and fee agreements. During her tenure at Siegel, she maintained a Rolodex contact directory at her desk including information regarding both personal and professional acquaintances.

{¶ 5} Prior to deciding to leave Siegel, Bauernschmidt discussed with Arter & Hadden the possibility of Siegel clients following her to her new firm. Moreover, Bauernschmidt acknowledged informing Arter & Hadden of the nature of the contingent fee structure that Siegel generally used to charge its clients for work similar to that Bauernschmidt would do for Arter & Hadden.

{¶ 6} In late August 1992, Arter & Hadden offered employment to Bauernschmidt. On September 2, Bauernschmidt gave notice to Siegel of her intent to leave the firm, effective September 23, 1992. During the three-week period before

her departure, during which she continued working at Siegel, Bauernschmidt informed Siegel clients with whom she spoke that other Siegel attorneys would be taking responsibility for their cases. If asked, Bauernschmidt would tell clients that she was leaving Siegel and joining Arter & Hadden.

{¶ 7} On the day prior to her departure, Siegel instructed Bauernschmidt in writing not to "directly or indirectly solicit" any of its clients in the future, implying that it considered its client list confidential. In addition, Siegel advised Bauernschmidt not to "take any lists or copies of lists of the firms [*sic*] clients or any other listed information of the firms [*sic*] business and any of the information in the firm's posession [*sic*] dealing with said clients."

{¶ 8} On her last day at the Siegel firm, Bauernschmidt removed personal belongings from her office, including the cards contained in her Rolodex file. Additionally, Bauernschmidt had possession of a Siegel client list in her home, which was available to her for a period of time after her departure, although she later returned it to her former employer, at its request.

{¶ 9} After leaving Siegel, Bauernschmidt wrote letters to Siegel clients notifying them of her new association with Arter & Hadden. The letters, written on Arter & Hadden stationery, read:

"During the past ten years, I have had the pleasure of providing legal services which have reduced your real estate taxes. I am pleased to announce that I have joined the Cleveland office of the law firm of Arter & Hadden.

"At Arter & Hadden, my legal practice will concentrate on real property and other state tax matters. I would like for us to continue our professional relationship. When you need assistance or have questions, please contact me."

{¶ 10} Bauernschmidt testified that she sent the letters to persons for whom she had performed legal work while at Siegel, and that she identified those persons from various sources, not excluding both her Rolodex file cards and the Siegel client

list. She further stated that she had discussed with Arter & Hadden the prospect of making such a mailing prior to sending the letters.

{¶ 11} Upon learning of Bauernschmidt's letters, Siegel issued letters to its clients, which read, in part:

"You may have recently received a letter from Karen Bauernschmidt, a former associate of this firm, which she has apparently sent to a significant number of clients of our firm, without our knowledge or authority. While her departure was amicable, her mailing of this type of letter was unexpected by us. In order to dispel any confusion with respect to your legal matters being handled by this office, I feel obliged to reply.

"Although Karen is no longer here, we have added additional legal and other professional personnel to our staff and are ready, willing and able to continue our services on your behalf. As you know, this firm's professional relationship with you is a valued one, and we shall continue representing you ably and professionally in your matters that you have entrusted to us, as well as any new items for which you decide to engage us."

{¶ 12} Following Bauernschmidt's departure from Siegel, Arter & Hadden sent a later mailing to solicit business for Bauernschmidt. The mailing consisted of a two-page solicitation describing the real property tax appraisal services that Arter & Hadden provided and listing Bauernschmidt as a person to contact for more information. In deposition testimony, Bauernschmidt stated that the solicitation was sent to current Arter & Hadden clients, but also to other targeted property owners irrespective of whether they were Arter & Hadden clients. She acknowledged that the solicitation reached Siegel clients. Bauernschmidt testified at deposition that she did not create the mailing list used in connection with this mailing and that the mailing list consisted of addresses of Arter & Hadden clients and others identified from business directories.

**{¶ 13}** Thereafter, an undetermined number of clients changed their legal representation from the Siegel firm to Bauernschmidt and requested the transfer of their files to her.

**{¶ 14}** In the first count of the complaint, Siegel claimed that Bauernschmidt and Arter & Hadden had tortiously interfered with Siegel's business relationships and contracts with clients by soliciting those clients to change their legal representation to Bauernschmidt and Arter & Hadden. In counts two and three of the complaint, Siegel alleged that Bauernschmidt had knowingly and willfully retained copies of confidential information and trade secrets belonging to Siegel, and that both defendants had tortiously misappropriated that information and improperly solicited Siegel clients. In count four of the complaint, Siegel alleged that Bauernschmidt had violated a fiduciary duty of loyalty owed to Siegel.

**{¶ 15}** Following discovery, the trial court granted summary judgment in favor of Bauernschmidt and Arter & Hadden, without opinion. The court of appeals reversed and ordered remand as to all claims presented in the complaint, except Siegel's claim of breach of fiduciary duty, for which summary judgment was affirmed as to the appellants.

**{¶ 16}** The cause is now before this court pursuant to the allowance of a discretionary appeal.

———————————

*Berkman, Gordon, Murray & DeVan*, *J. Michael Murray*, *Larry S. Gordon* and *Brooke F. Kocab*, for appellees.

*Gallagher, Sharp, Fulton & Norman*, *Gary L. Nicholson* and *D. John Travis*, for appellants.

———————————

**MOYER, C.J.**

**{¶ 17}** The determinative issues in this case are (1) whether it was error for the trial court to grant summary judgment in favor of Karen Bauernschmidt and Arter

& Hadden as to Siegel's claim of tortious interference with contract, and (2) whether it was error for the trial court to grant summary judgment in favor of Karen Bauernschmidt and Arter & Hadden as to Siegel's claim of misappropriation of trade secrets.

{¶ 18} *Tortious interference with contract.* We reaffirm the elements of the tort of tortious interference with contract as enumerated in paragraph two of the syllabus of *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863. They are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.

{¶ 19} In *Kenty* we quoted with approval 4 Restatement of the Law 2d, Torts (1979), Section 766, which provides: "One who intentionally and *improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (Emphasis added.) *Kenty* at 418-419, 650 N.E.2d at 866. Only improper interference with a contract is actionable, as reflected in the fourth element of the tort as set forth in the *Kenty* syllabus. Thus, even if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified. "The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." 4 Restatement of the Law 2d, Torts, at 28, Section 767, Comment *b.* We today reaffirm *Kenty* and hold that establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper.

**{¶ 20}** Bauernschmidt and Arter & Hadden contend that the record creates no genuine issue of material fact, and that they are entitled to summary judgment in that they were justified in contacting clients of Fred Siegel and soliciting them to change legal representation. They cite several Disciplinary Rules contained in the Code of Professional Responsibility and argue that their actions fall within those rules. They further assert that they are entitled to summary judgment because a client has a legal right to terminate an existing attorney-client relationship, with or without cause, and to hire a new attorney. *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry* (1994), 68 Ohio St.3d 570, 629 N.E.2d 431, paragraph two of the syllabus.

**{¶ 21}** Appellants argue that DR 2-102(A)(2) authorizes a lawyer to distribute professional announcement cards stating "new or changed associations or addresses, change of firm name, or similar matters pertaining to the professional offices of a lawyer or law firm." However, in this case, appellant Bauernschmidt exceeded the authorization of DR 2-102. In her letters to Siegel clients she not only provided information as to her change of law firms, but also expressed a willingness to continue providing legal services at the new firm ("I would like for us to continue our professional relationship. When you need assistance or have questions, please contact me."). She thereby solicited Siegel clients to change legal representation.

**{¶ 22}** We note that American Bar Association Model Rule of Professional Conduct 7.3(c) implies that an attorney may solicit professional employment by making a direct written communication to persons with whom the lawyer has a "family or prior professional relationship," without labeling it "Advertising Material." However, the corresponding Ohio rule, DR 2-101(F)(2)(e), provides that where written direct mail solicitations are made to persons who may be in need of specific legal services, the mailing must include the recital "ADVERTISEMENT ONLY," of specified size and color, both in the text and on the envelope. No exception from this requirement is expressly included in DR 2-101 for communications to family and past clients. However, the Board of Commissioners on Grievances and Discipline in

Opinion No. 98-5 (Apr. 3, 1998) expressed the view that a departing attorney may notify clients of his or her departure from a law firm, identify his or her new location of practice, and indicate a willingness to provide services at the new location without violating ethical standards.

{¶ 23} Appellants further argue that Bauernschmidt not only was permitted but had an ethical duty to inform clients with whom she had worked of her departure from Siegel. They cite DR 2-110(A)(2), which imposes a duty upon an attorney who intends to "withdraw from employment" to first "take[ ] reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules." However, we do not accept appellants' contention that this rule is applicable to the case at bar.

{¶ 24} Bauernschmidt herself acknowledged that the parties for whom she worked while an associate at the Siegel firm were not "her" clients but were clients of Fred Siegel Co., L.P.A. Although her work as an employee of that firm resulted in the establishment of an attorney-client relationship with Siegel clients, Bauernschmidt had never entered into a contractual agreement with those clients under which she personally was obligated to provide legal services. DR 2-110 is designed to avoid the danger of a client being left unrepresented upon an attorney's withdrawal. These dangers were not generated when Bauernschmidt left the Siegel firm. Because Bauernschmidt was never employed by Siegel clients, she did not withdraw from employment by them, and DR 2-110 is simply not applicable.

{¶ 25} Moreover, the fact that a client has a right to discharge his or her attorney, pursuant to *Reid, Johnson,* does not, of itself, provide a competing attorney with justification for encouraging the client to exercise that right, and thus does not necessarily preclude a finding that a tortious interference with contract has occurred.

**{¶ 26}** We thus reject appellants' arguments that the Disciplinary Rules they cite provide justification for their actions.

**{¶ 27}** In any event, we reject the suggestion that the propriety of an attorney's conduct for purposes of a tortious interference analysis should be determined solely by application of the Disciplinary Rules. The purpose of disciplinary actions is to protect the public interest and to ensure that members of the bar are competent to practice a profession imbued with the public trust. *Disciplinary Counsel v. Trumbo* (1996), 76 Ohio St.3d 369, 667 N.E.2d 1186. These interests are different from the purposes underlying tort law, which provides a means of redress to individuals for damages suffered as a result of tortious conduct. Accordingly, violation of the Disciplinary Rules does not, in itself, create a private cause of action. *Am. Express Travel Related Serv. Co. v. Mandilakis* (1996), 111 Ohio App.3d 160, 675 N.E.2d 1279. The lower courts in this case correctly recognized that improper solicitation of clients in violation of the Disciplinary Rules does not independently constitute a tort.

**{¶ 28}** Moreover, the power to determine violations of the Disciplinary Rules is reserved to this court. *Melling v. Stralka* (1984), 12 Ohio St.3d 105, 12 OBR 149, 465 N.E.2d 857. Were we to hold that a lawyer's compliance with the Code of Professional Responsibility is an absolute defense to a claim of tortious interference with contract, we would effectively be delegating our authority to determine violations of the Disciplinary Rules to the trial courts. Rather, consistent with our adoption in *Kenty* of Restatement Section 766, which sets forth the elements of tortious interference with contract, the propriety of the appellants' conduct in contacting Siegel's clients and suggesting that they follow Bauernschmidt to Arter & Hadden should be determined by applying relevant legal tests as defined in Section 766 *et seq.* of the Restatement.

**{¶ 29}** We therefore adopt Section 767 of the Restatement, which provides guidelines to be followed in determining whether an actor's interference with another's contract is improper. Accordingly, in determining whether an actor has

acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. *Id.*

{¶ 30} Within this framework the standards defined in the Disciplinary Rules, which govern the conduct of all attorneys, are relevant in determining the propriety of an attorney's conduct in a tortious interference claim pursuant to the Restatement. See Comment *c* to Section 767, at 32 ("Violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may also be significant in evaluating the nature of the actor's conduct as a factor in determining whether his interference with plaintiff's contractual relations was improper or not.").

{¶ 31} The standards of the Disciplinary Rules are relevant to, but not determinative of, the propriety of an attorney's conduct for purposes of a tortious interference with contract claim. Similarly relevant are the interests of clients in being fully apprised of information relevant to their decisionmaking in choosing legal representation and appellants' interests in engaging in constitutionally protected free speech.

{¶ 32} Moreover, Section 768 of the Restatement provides that fair competition may constitute a proper ground, or justification, for an interference with an existing contract that is terminable at will.[1]  Thus, where an existing contract is

---

1. Section 768 of the Restatement of the Law 2d, Torts (1979), provides:
    "(1)  One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

terminable at will, and where all the elements of Section 768 of the Restatement are met, a competitor may take action to attract business, even if that action results in an interference with another's existing contract.  Where a defendant in an action for tortious interference with contract establishes that his or her conduct falls within Section 768, the factfinder need not balance the factors set forth in Section 767.  See Section 767, Comment *a*, at 27 ("The specific applications in [Section 768] supplant the generalization expressed in [Section 767].").

{¶ 33} We today adopt Section 768 of the Restatement and accordingly hold that establishment of the privilege of fair competition, as set forth in Section 768 of the Restatement, will defeat a claim of tortious interference with contract where the contract is terminable at will.

{¶ 34} The fact that Siegel clients had a legal right to change their legal representation pursuant to *Reid, Johnson,* 68 Ohio St.3d 570, 629 N.E.2d 431, triggers availability of the justification of fair competition provided by Section 768 of the Restatement, as, by law, their contracts with Siegel were terminable at will.  The privilege of fair competition has been recognized in the context of the legal profession. *Ramirez v. Selles* (1989), 308 Ore. 609, 784 P.2d 433; *Koeppel v. Schroder* (1986), 122 A.D.2d 780, 782, 505 N.Y.S.2d 666, 669.  See, also, Hillman, Law Firms and Their Partners: The Law and Ethics of Grabbing and Leaving (1988), 67 Tex.L.Rev. 1, 22 ("[I]f the interfering party is a competitor and 'does not employ wrongful means,' interference with an existing terminable-at-will contract, or a prospective contractual relation, is not improper."); Johnson, Solicitation of Law Firm Clients by

---

"(a) the relation concerns a matter involved in the competition between the actor and the other and
"(b) the actor does not employ wrongful means and
"(c) his action does not create or continue an unlawful restraint of trade and
"(d) his purpose is at least in part to advance his interest in competing with the other.
"(2)  The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."

Departing Partners and Associates: Tort, Fiduciary, and Disciplinary Liability (1988), 50 U.Pitt.L.Rev. 1, 86 ("Once the attorney-client contract is recognized as terminable at will, there can be little doubt as to the applicability of section 768 to departure-based solicitation.").

{¶ 35} Pursuant to Section 768, competition is proper if (a) the relation between the actor (here Bauernschmidt and Arter & Hadden) and his or her competitor (here Siegel) concerns a matter involved in the competition between the actor and the other, and (b) the actor does not employ wrongful means, and (c) his action does not create or continue an unlawful restraint of trade, and (d) his purpose is at least in part to advance his interest in competing with the other. Thus, appellants would be entitled to summary judgment pursuant to Section 768 only if the record establishes that each of those elements was met.

{¶ 36} We do not find the existence of any genuine issue of fact in this case as to the establishment of elements (a), (c), and (d) as outlined above. We find, however, that the record before us reflects unresolved issues of fact as to whether Bauernschmidt and Arter & Hadden employed wrongful means in competing with Siegel. The evidence is ambiguous as to whether Bauernschmidt and Arter & Hadden used information acquired through improper means in their competitive efforts, *e.g.*, information protected as trade secrets, or information as to Siegel's fee arrangements with clients that may have been wrongfully disclosed. Further proceedings are required to determine whether appellants employed wrongful means within the contemplation of Restatement Section 768 in competing against Siegel.

{¶ 37} We therefore reject appellants' argument that the record demonstrates the existence of justification beyond any genuine issue of material fact so as to defeat Siegel's claims of tortious interference with contract. We affirm the judgment of the court of appeals and remand those claims to the trial court for disposition according to the legal principles set forth herein.

**{¶ 38}** *Misappropriation of Trade Secrets.* Misappropriation of trade secrets is a recognized tort in Ohio for which damages may be obtained. *Wiebold Studio, Inc. v. Old World Restorations, Inc.* (1985), 19 Ohio App.3d 246, 19 OBR 398, 484 N.E.2d 280.

**{¶ 39}** In her deposition Bauernschmidt did not deny using the Siegel client list to identify recipients and addresses for solicitation mailings. The appellants conceded in the trial court that Bauernschmidt "does not know if she consulted the client list." Appellants nevertheless argue that they were entitled to summary judgment on Siegel's claim of misappropriation of trade secrets because Siegel did not take adequate steps to protect the confidentiality of the information in the client list.

**{¶ 40}** During 1992, former R.C. 1333.51(A)(3)[2] provided the definition of a "trade secret." The statute provided that a "trade secret" included any "listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge." 132 Ohio Laws, Part I, 676. The statute provided that such a listing was "presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes."

**{¶ 41}** A possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status, and a claimant asserting trade secret status has the burden to identify and demonstrate that the material is included in categories of protected information under the statute. *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.* (1997), 80 Ohio St.3d 513, 525, 687 N.E.2d 661, 672.

---

2. R.C. 1333.51 was repealed, effective July, 1, 1996. 146 Ohio Laws, Part IV, 7809. "Trade secret" is now defined at R.C. 1333.61(D).

**{¶ 42}** The question whether a particular knowledge or process is a trade secret is, however, a question of fact to be determined by the trier of fact upon the greater weight of the evidence. *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.* (1986), 24 Ohio St.3d 41, at 47, 24 OBR 83, at 88, 492 N.E.2d 814, at 819.

**{¶ 43}** Accordingly, we hold that, pursuant to former R.C. 1333.51(A)(3), listings of names, addresses, or telephone numbers that have not been published or disseminated, or otherwise become a matter of general public knowledge, constitute trade secrets if the owner of the list has taken reasonable precautions to protect the secrecy of the listing to prevent it from being made available to persons other than those selected by the owner to have access to it in furtherance of the owner's purposes.

**{¶ 44}** Siegel claims that Bauernschmidt and Arter & Hadden tortiously misappropriated the information contained in Siegel's client list and used it for their own economic gain. We find that genuine issues of material fact exist precluding entry of summary judgment in appellants' favor on this claim. The record demonstrates that the Siegel client list was maintained on a computer that was protected by a password. Hard copies of the list were stored within office filing cabinets, which were sometimes locked. Fred Siegel testified during deposition that he "probably" had told employees that the client list information was confidential and not to be removed from the office.

**{¶ 45}** These facts raise a genuine issue of material fact as to whether Siegel took reasonable actions to ensure that only authorized persons had access to his client list for authorized uses. Cf. *Valco,* 24 Ohio St.3d 41, 24 OBR 83, 492 N.E.2d 814 (finding of trade secret status justified where employer, *e.g.*, kept plant locked, screened all visitors, and disclosed drawings contended to be trade secrets only to suppliers for bidding purposes and only to employees with specific need for them).

**{¶ 46}** Bauernschmidt and Arter & Hadden further contend that all of the information in Siegel's client lists was a matter of public record, capable of being

independently assembled into a list, and that this fact precluded a finding that the Siegel list qualified as a trade secret.

{¶ 47} In *Valco* we acknowledged, in dicta, that a competitor could obtain and use a trade secret where the competitor itself discovered the information by independent invention or "reverse engineering," *i.e.*, starting with a known product and working backward to find the method by which it was developed. *Id.,* 24 Ohio St.3d at 45-46, 24 OBR at 86, 492 N.E.2d at 818. In this case, a question of fact exists as to whether the appellants, in effect, "independently invented" their own list of property owners, resulting in a list similar to the Siegel list, or, whether they simply used Siegel's computer-generated client list.

{¶ 48} Where information is alleged to be a trade secret, a factfinder may consider, *e.g.*, the amount of effort or money expended in obtaining and developing the information, as well as the amount of time and expense it would take for others to acquire and duplicate the information. *Plain Dealer*, 80 Ohio St.3d at 524-525, 687 N.E.2d at 672. The Siegel client list was sixty-three pages in length and included the names of property owners, contact persons, addresses, and telephone numbers of hundreds of clients. The extensive accumulation of property owner names, contacts, addresses, and phone numbers contained in the Siegel client list may well be shown at trial to represent the investment of Siegel time and effort over a long period.

{¶ 49} The purpose of Ohio's trade secret law is to maintain commercial ethics, encourage invention, and protect an employer's investments and proprietary information. *Levine v. Beckman* (1988), 48 Ohio App.3d 24, 28, 548 N.E.2d 267, 271. That purpose would be frustrated were we to except from trade secret status any knowledge or process based simply on the fact that the information at issue was capable of being independently replicated.

{¶ 50} The court of appeals correctly determined that the trial court erred in granting summary judgment to Bauernschmidt and Arter & Hadden on Siegel's claim of the tort of misappropriation of trade secrets.

{¶ 51} For the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed*
*and cause remanded.*

RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

PFEIFER, J., concurs in the dissenting opinion of COOK, J., except for the section entitled "Modification of the *Kenty* Test."

COOK, J., dissents.

_____

**COOK, J., dissenting.**

{¶ 52} I believe that the trial court correctly granted summary judgment in favor of Bauernschmidt in this case. To come to that conclusion, I resolve certain underlying issues differently from the majority. First, Siegel clients with whom Bauernschmidt worked were not just Siegel's clients, but also Bauernschmidt's clients. Second, the information developed by Siegel as a "client list" may be protectable as a trade secret, but the identities of Bauernschmidt's clients cannot be trade secrets. Third, Bauernschmidt was therefore entitled, upon leaving Siegel, to contact those clients with whom she had worked while with the Siegel firm. Fourth, use of the "client list" by Bauernschmidt for purposes of preparing a mailing to the clients with whom she worked while with the Siegel firm would not amount to misappropriation of the trade secret properties of the Siegel client list.

### Court of Appeals' Judgment

{¶ 53} The court of appeals held that the client names on Bauernschmidt's Rolodex were properly retained by her because those were names of clients she had represented while with the Siegel firm. Siegel did not appeal that judgment. The law of the case, then, is that Bauernschmidt could properly use those Rolodex cards to compile her mailing to Siegel clients she represented while with the Siegel firm.

**{¶ 54}** The court of appeals, however, held that the potential trade secret violation here was Bauernschmidt's use of the client list *to compile* her mailing list of *former clients*. The court implicitly distinguished Bauernschmidt's use of "Rolodex names" from her use of the Siegel "client list" based upon the fact that the Siegel "client list" included *all* of Siegel's clients, not just those clients for whom Bauernschmidt worked. But if the reference to the Rolodex names is no violation (given that those clients were her clients as well as the firm's clients, see discussion *infra*) and those Rolodex names appear in the compilation of all Siegel clients, as they necessarily would, then it is incongruous to hold that Bauernschmidt's reference to the Siegel client list for the names of her former clients would violate trade secret law. In other words, it was inconsistent for the court of appeals to say that Bauernschmidt could look at her Rolodex to compile her mailing, but that she could not reference the client list for the same purpose: contacting her former clients.

**{¶ 55}** The court of appeals erred in elevating names of Bauernschmidt's former clients (otherwise permitted to be used) to protectable trade secret status simply because those names appeared on Siegel's client list along with its other clients whom Bauernschmidt had not represented.

### Dual Status of Clients

**{¶ 56}** Both Siegel and the majority opinion discuss whether the clients Bauernschmidt represented while with the Siegel firm are her clients or Siegel's. They are both hers and the firm's. The firm has a relationship with the client, but the servicing lawyer also has her own lawyer-client relationship. Siegel acknowledges this concept with joint references in the complaint. At paragraph one, the complaint identifies two plaintiffs: Fred Siegel Co., L.P.A., a licensed professional association of attorneys doing business in Ohio, and Fred Siegel, a principal member of that licensed professional association. The complaint then repeatedly refers to "plaintiffs' clients," thereby implying the clients' dual status as firm clients and also Fred Siegel's clients.

### A Lawyer's Clients Are Not Eligible for Trade Secret Protection

**{¶ 57}** Clients may not be reserved to any lawyer or firm as a trade secret. Cases from Ohio and other jurisdictions have long held that a client's right to choose an attorney must be free and unfettered. Disciplinary Rules prohibiting noncompete provisions between lawyers (DR 2-108), requirements that client files be returned (DR 2-110[A][2]), and other similar doctrines have evolved in recognition of the professional and intensely personal nature of the attorney-client relationship.

**{¶ 58}** From Fred Siegel's deposition testimony, it seemed that in filing this lawsuit he misunderstood the state of the law on departure-based communications. He testified that he believed it improper for any lawyer leaving a firm to contact any client of the former firm with the intent of seeking to take that client to the new firm. It is from this mistaken perspective that the case proceeded.

**{¶ 59}** This court has recognized that a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject only to the obligation to compensate the attorney or firm for services rendered prior to the discharge. See *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*

(1994), 68 Ohio St.3d 570, 629 N.E.2d 431, paragraph one of the syllabus. " 'The attorney-client relationship is consensual, highly fiduciary on the part of counsel, and he may do nothing which restricts the right of the client to repose confidence in any counsel of his choice. * * * No concept of the practice of the law is more deeply rooted.' " *Corti v. Fleisher* (1981), 93 Ill.App.3d 517, 522-523, 49 Ill.Dec. 74, 417 N.E.2d 764, 769, quoting *Dwyer v. Jung* (1975), 133 N.J.Super. 343, 347, 336 A.2d 498, 500. "[E]ach person must have the untrammelled right to the counsel of his choice." *Corti* at 523, 49 Ill.Dec. 74, 417 N.E.2d at 769.

{¶ 60} A departing attorney may notify clients of his or her departure from a law firm, identify his or her new location of practice, and indicate a willingness to provide legal services at the new location. Such communication is permitted under DR 2-102(A)(1) and (2) and DR 2-103(A). Respect for a client's choice demonstrates to the client and to the public that the lawyer and law firm are truly practicing a profession. Board of Commissioners on Grievances and Discipline (Apr. 3, 1998), Opinion No. 98-5.

{¶ 61} Therefore, Bauernschmidt's former clients cannot be Siegel's trade secrets. Even when a lawyer or firm compiles a client list as Siegel did, the mere listing of clients' names cannot confer trade secret protection.

Limits of Trade Secret Protection of Siegel's Client List

{¶ 62} Useful information formatted into an attorney's or law firm's client list, however, may be protectable as a trade secret. Former R.C. 1333.51(A)(3). The statutory language includes lists and compilations. The purpose of Ohio's trade secret law is "to maintain standards of commercial ethics * * * as well as the protection of the substantial investment of employers in their proprietary information." *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.* (1986), 24 Ohio St.3d 41, 48, 24 OBR 83, 89, 492 N.E.2d 814, 820, citing *Kewanee Oil Co. v. Bicron Corp.* (1974), 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315; see, also, *Levine v. Beckman* (1988), 48 Ohio App.3d 24, 28, 548 N.E.2d 267, 271. Thus, trade

secret law would protect Siegel's investment in developing the compilation aspects of its client lists—the cross-referencing of a given client's name with parcel numbers, the names of other property owned or managed by that same client, billing names and phone numbers, the identity of clients if different from the named tax plaintiff, the identity of owners of properties, and the contact people of leased property. If Bauernschmidt and/or Arter & Hadden took from Siegel the advantage it had earned through the time and effort invested in compiling such information, that usurpation could support a claim for misappropriation of a trade secret, provided that Siegel also could prove the secrecy requirements of the claim. But Siegel established no issue of fact that Bauernschmidt usurped the protectable aspects of its compilation. Siegel was only able to show that Bauernschmidt may have referred to the list during the process of generating a mailing list of her former clients. But the identities of her clients may not be trade secrets, and the use of Siegel's list merely to obtain or double-check addresses, spelling, and the like, of only those clients Bauernschmidt worked with is not misappropriation.

### Summary Judgment Properly Granted

{¶ 63} Because trade secret law does not bar Bauernschmidt's referring to the Siegel client list to contact her former clients, summary judgment in favor of Bauernschmidt is properly granted unless Siegel, in its response, put in dispute the truth of Bauernschmidt's claimed limited use of the list.

{¶ 64} In Bauernschmidt's affidavit, she states in paragraph 6: "The only clients of the Siegel firm I contacted were those clients for whom I had done work during my tenure at that firm." In its response to defendants' motion for summary judgment, Siegel alleged that "[s]olicitation letters * * * were sent to clients of [Siegel] with whom defendant Bauernschmidt had never met or worked."

{¶ 65} Fred Siegel testified in his deposition:

"Q. Do you know of any client that she worked for?

"A.  Specifically?  No, she worked with — there was no restriction on any client she worked for, actually, other than if the client directed otherwise which they did on occasion.

"Q.  So she could have worked for any client in the office?

"A.  That's correct.

"Q.  Do you have any information that Mrs. Bauernschmidt now has a client formally with your office other than the clients she worked for while at your office?

" * * *

"A.  I know of certain ones that she didn't work for.  Well, I'm not sure.  I can't answer that question.

" * * *

"Q.  You don't know exactly who [*sic*] she contacted, do you?

"A.  No, but I will find out.  Almost everybody called me and sent me copies."

**{¶ 66}** In later responding to the Bauernschmidt and Arter & Hadden motion for summary judgment, Siegel merely reasserted the allegation that solicitation letters were sent to clients of the Siegel firm with whom Bauernschmidt did not work.  In support, Siegel was unable to offer any evidence beyond the same deposition testimony quoted above along with certain nonsupportive deposition testimony from Bauernschmidt.

**{¶ 67}** Siegel's summary judgment response sought to succeed on the inadequacy of  Bauernschmidt's affidavit.  But because Siegel took the position that any reference to the client list by Bauernschmidt was a trade secret violation, its response failed to raise an issue of fact on the *material* issue:  whether Bauernschmidt contacted Siegel clients other than those with whom she worked. The court of appeals' reversal of summary judgment cannot be sustained based only upon Siegel's suspicions that Bauernschmidt solicited Siegel clients for whom she did not work.  The appellants sustained their initial burden by submitting, *inter alia*,

Bauernschmidt's affidavit testimony establishing that the only clients who followed her from the Siegel firm to Arter & Hadden were clients for whom she had worked. Siegel did not sustain its reciprocal burden under Civ.R. 56(E) to "set forth specific facts showing that there is a genuine issue for trial" that Bauernschmidt solicited Siegel clients for whom she had not worked.

{¶ 68} The evidence cited by the court of appeals as establishing an issue of fact, the matching misspellings from the Siegel client list and Bauernschmidt's client letters, only supports the inference that she looked to Siegel's client list to prepare her letters. Her limited reference to the client list for the correct mailing information for her former clients does not implicate trade secret protections.

{¶ 69} Because Siegel has no cause of action for a trade secret violation if there is no evidence that Bauernschmidt exceeded her right to contact former clients, summary judgment was properly granted. I would affirm the trial court's grant of summary judgment in favor of Bauernschmidt on Siegel's claim of misappropriation of trade secret.

Tortious Interference

{¶ 70} My conclusions on the trade secret issues dictate affirming summary judgment for Bauernschmidt on Siegel's tortious interference claim. The court of appeals held that Siegel's "business interference [claim] is dependent on whether or not the information that Bauernschmidt retained was in fact a trade secret; if so, then the use of that information could be found to be tortious." Likewise, the majority decides to affirm on the basis that the usurping of a trade secret could satisfy the "wrongful means" prong of the fair competition analysis found in Section 768 of the Restatement of Torts 2d. Given that Siegel could not refute Bauernschmidt's limited, proper use of the client list, then Bauernschmidt is protected by the fair competition privilege discussed in the majority opinion. Though the majority also mentions that disclosure of fee information might support a finding of wrongful means, the court of appeals' decision in favor of

Bauernschmidt on that issue precludes Siegel challenging that here, as Siegel did not appeal from the court of appeals' judgment.

{¶ 71} I would reverse the court of appeals' judgment because the trial court properly granted summary judgment in favor of Bauernschmidt on Siegel's claim of tortious interference with contract.

Modification of the *Kenty* Test

{¶ 72} Even if I were to agree with the majority on the disposition of this case, I would take this opportunity to modify paragraph two of the syllabus of *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, so that it agrees with the Restatement of Torts 2d.

{¶ 73} The *Kenty* court, while professing to adopt the elements of tortious interference with contract set forth in the Restatement, established that the fourth element in proving tortious interference is "lack of justification." *Id.* at 419, 650 N.E.2d at 866. The Restatement, however, does not mention "justification" in the relevant sections themselves, but only in its introductory note and in its comment sections. See 4 Restatement of the Law 2d, Torts (1979), Sections 766, 767, and 768. And when the Restatement does discuss justification, it is to discuss the problems with its use as a defense. *Id.* The introductory note discusses alternative word choices for the test, including the word "justification," and concludes by stating that "[t]he word adopted for use in this Chapter, neutral enough to acquire a specialized meaning of its own for the purposes of the Chapter, is 'improper.' " *Id.* at Introductory Note at 6. The comments explain the confusion that can result by using the language "without justification" in the test because the question then becomes "who has the burden to prove what?" See, *e.g.*, *id.* at 37-38, Comment *k*, Section 767.

{¶ 74} The *Kenty* court added an element not contained in the recommended language of the Restatement and unfortunately distorted the proper test. Justification connotes a "lawful excuse or reason." Black's Law Dictionary (6

Ed.1990) 865. And according to Black's, the "[t]erm is not widely used in torts[.]" *Id.* at 866. The Restatement does not require either party to a tortious-interference-with-contract action to prove justification or a lack thereof. Instead, it requires that the plaintiff prove improper interference. According to the Restatement, a party may interfere with a contract, and as long as the interference is not improper, no tort has been committed. "Justification" is simply not an accurate term for the element required.

**{¶ 75}** Therefore, *Kenty*'s second syllabus paragraph should be modified to coincide with the Restatement so that in Ohio, "[i]n order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, [(4) by improper means], and (5) resulting damages." *Kenty*, 72 Ohio St.3d 415, 650 N.E.2d 863, paragraph two of the syllabus. What constitutes "improper means" is explained in the Restatement. See Restatement of Torts 2d at 39, Section 768, and at 39-44, Comments *a* through *i*.

---