I respectfully dissent from the opinion of the majority on the basis that they have misinterpreted the concept of privilege with respect to determining whether appellees' interference with appellants' contract was improper.
The torts of interference with business relationships and contract rights generally occur when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another. A B-Abell Elevator Co., Inc. v. Columbus/Cent. OhioBldg. Constr. Trades Council (1995), 73 Ohio St.3d 1, 14; Smith v.Klein (1985), 23 Ohio App.3d 146, 148, fn. 1; Juhasz v. Quickships, Inc.
(1977), 55 Ohio App.2d 51, 57. A claim for tortious interference with a contract contains the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Fred Siegel Co., L.P.A. v.Arter Hadden (1999), 85 Ohio St.3d 171, paragraph one of the syllabus.
Under Ohio law, even if the defendant's interference with another's contract causes damages, that interference does not constitute a tort if the interference is justified. Siegel at 176. Hence, the fourth element, lack of justification, requires proof that the defendant's interference with another's contract was improper. Id. at paragraph two of the syllabus. Appellees are correct in their assertion that the burden was on appellants, as plaintiffs, to prove that there was a lack of legitimate justification or privilege on the part of appellees.
To determine whether a defendant acted improperly or without justification or privilege in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors:
 "* * * (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." Id. at paragraph three of the syllabus. See, also, Juhasz at 57.
Furthermore, the very authority cited by appellants in their brief to this court indicates why summary judgment was appropriate:
 "One is privileged to purposely cause another not to perform a contract, or enter into or continue a business relation with a third person, by in good faith asserting or threatening to properly protect a valid legal interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transition. Juhasz v. Quickships Inc. (1977), 55 Ohio App.2d 51, 57" (Emphasis added.)
The summary judgment material submitted by appellees is replete with uncontradicted facts, which support their claim of a good faith belief that the legal interests of the association were being jeopardized by the actions of appellants. In fact, under Priorway's regulations, appellees were charged with protecting the legal interests of the association.
The majority emphasizes the alleged lack of notice to appellant, Claire Parker ("Parker"), of the rule prohibiting public garage sales or auctions. However, Parker freely acknowledged in her deposition that as an association member, she knew she was bound by the original Priorway regulations. She did not dispute the validity of the provisions in the regulation, in particular Article VII, Section 1, which authorized the ability of the association to promulgate rules that would be reflected in the minutes. In fact, she stated she had legal counsel review the regulations prior to purchase.
Presuming that Parker had no notice of the specific rule governing public sales and auctions prior to purchasing her property, she is still bound by the regulations and the rule. The reason is that Parker has failed to demonstrate or claim that she would not have purchased her property if she had known about the garage sale rule prior to purchase. Instead, Parker's claim is that she became aware of the rule too late to effectively stop the sale without damage.
Further, when asked about her term as secretary of the association, which began in 1996, Parker indicated that, at that time, she was given a box with the minutes of all the meetings in it. Thus Parker had custody of all the relevant minutes, including the rule banning public garage sales and auctions, in her possession and control long before she arranged for the sale. Nevertheless, she failed to make an effort to review those minutes.
Beyond the specific rule at issue, appellants did not dispute that the association was responsible for the 50 acres of common land, which comprised of the common entrance driveway, a lake, a stable and a paddock area. Appellants also did not dispute the right and obligation of the association to regulate the use, maintenance and security of those common areas.
The association and its officers not only had a valid interest in maintaining the privacy and security of the association members, they had an obligation to do so. Parker's deposition indicates that she understood that as many as three hundred people would be attending the sale. Her plans for the sale were a fait accompli before the association became aware of those plans. Further, she made no effort to clear this anticipated invasion with the association. It is hard to imagine how Priorway and its officers could have done anything other than express a valid concern for the security, safety and liability exposure of the association members whom they represented.
Mark Teague ("Teague"), the then president of the association, was deposed as to the sequence of events, which preceded the claimed tortious interference. He indicated that there were three primary points he felt he had communicated to Suzanne Gloden ("Gloden"): (1) that there was a rule prohibiting such a sale; (2), that if nonmembers were brought into the common property, Gloden and Parker would be responsible for their safety and behavior; and (3) the association intended to hire security during the hours of the sale and would send her the bill.
We agree that there was considerable dispute as to whether those concerns were, in fact, communicated in that fashion to Gloden. Nevertheless, there is nothing, which contradicts Teague's claim that those concerns represented his state of mind and that of the association. Hence, what he actually said to Gloden is irrelevant except to the extent that it caused Gloden to cancel the auction.
The majority seems to imply that appellees had to have proven anenforceable legal right, which would justify interference with the contract. That is not what the law requires. The law requires that appellees have a good faith belief that they had "a legally protected interest." Juhasz at 57. Every item that was submitted with the summary judgment exercise is consistent with the following: appellees had a good faith belief that what Parker was doing was prohibited under Priorway's rules and regulations; the majority of the members did not wish to make an exception or repeal the ban on public garage sales or auctions; and Priorway and its officers were to protect the rights of the association.
Even if the specific rule prohibiting public garage sales and auctions were found to be invalid, the regulations themselves clearly provided a general mandate for the officers to protect, secure and minimize any liability for the common areas on behalf of the occupants of the Priorway. The association and its officers did not need to have a 100 percent verifiable certainty that they, indeed, did have a valid, legally enforceable right. All that appellees needed was a good faith belief that they had a legally protected interest which might be impaired or destroyed by the performance of the contract. Appellees certainly had reasons for that belief.
Finally, on the issue of damages, the deposition of Gloden was very specific that $10,000 was the only certain figure that she had as to the value of those objects offered for sale. She was free to admit that the $17,365 figure was a best case scenario and one that was unlikely to be achieved, even at the sale. To successfully assert a claim for lost profits resulting from a breach of contract claim, appellants, as plaintiffs, must show that: (1) such profits were within contemplation of the parties at the time the contract was made; (2) the loss was a probable result of the breach; and (3) profits were not remote and speculative but, instead could be shown with reasonable certainty. CharlesR. Combs Trucking, Inc. v. Internatl. Harvester Co., (1984),12 Ohio St.3d 241, paragraph two of the syllabus. Under the available evidence in this case, the maximum potential damage would be the difference between the net amount Parker received and the net amount she would have received if the gross sales had amounted to $10,000.
For the reasons stated, I respectfully dissent.
JUDITH A. CHRISTLEY