John PETROVSKI, Plaintiff

v.

FEDERAL EXPRESS CORPORATION, et al., Defendants

No. 3:02CV7099.

United States District Court, N.D. Ohio, Western Division.

Jan. 6, 2002.

---

Kathryn T. Joseph, Aggers & Joseph, Vincent L. Cheverine, Aggers & Joseph, Pepper Pike, OH, for plaintiff.

Michele L. Fowler, FedEx Express, Memphis, TN, Sue Marie Douglas, Millisor & Nobil, Cleveland, Linda Carr, Church & Dwight Co., Inc., Mark Bilawsky, Church & Dwight Co., Inc., Princeton, NJ, Rolf H. Scheidel, Shumaker, Loop & Kendrick, Toledo, OH, for defendants.

## ORDER

CARR, District Judge.

Plaintiff John B. Petrovski brings this diversity suit against defendant Church & Dwight Company for intentional interference with a business relationship. This court has jurisdiction pursuant to 28 U.S.C. § § 1332 and 1441. Pending is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, defendant's motion shall be denied.

## BACKGROUND

Plaintiff worked as a Federal Express Corporation ("Fed Ex") courier from July, 1989, until terminated on September 15, 2000. During the five years preceding his termination, plaintiff made deliveries on a nearly daily basis to defendant Church & Dwight, a producer of sodium bicarbonate located in Old Fort, Ohio. During that time, plaintiff became acquainted with Church & Dwight employees and would often engage these employees, including Dana Miller and Bridget Droll, in "non-business" conversation.

Miller was the accounts payable clerk and receptionist for Church & Dwight. She usually signed for Fed Ex packages. Droll was a shipping clerk and employee of the Church & Dwight Stores Department. Plaintiff discussed mutual interests with these women, including their respective families, current events, sports, and firearms.

These conversations became the basis for a complaint by Church & Dwight to Fed Ex. As a result of this complaint from its customer, Fed Ex fired the plaintiff. The Church & Dwight complaint related to two incidents.

First, plaintiff had developed the habit of entering the schedule and scores of the Minnesota Vikings football team on a calendar hanging on the inside door to Miller's office. According to plaintiff, he began marking the calendar in 1998, and Miller expressly permitted him to do so. Miller testified: "I don't think it was a big deal. I don't even really remember the very first time he did it." Miller Dep. 24. Droll stated: "I never observed Dana Miller complain to John about writing on her calendar. Nor did Dana ever tell me that she wished John would not do so." Droll Aff. ¶ 9.

On September 12, 2000, plaintiff observed that his markings on the calendar had been crossed off. Miller told plaintiff that the maintenance man, Bill Biller, had crossed off the schedule because, according to Biller, it was a violation of company policy to deface its property.

According to plaintiff, Miller continued to tell plaintiff that Biller was not much of an individual, not much of a worker, and that he was not well liked by his peers. Plaintiff responded that Biller sounded like a "brick-through-the-window kind of guy." Pl. Dep. 121. According to plaintiff, this means "somebody who's worthless and useless." *Id.*

The next day, plaintiff brought in a new calendar containing the Vikings' schedule and taped it on Miller's door below the other calendar.

On September 14, 2000, John Lohman, the Controller/MIS Manager at Church & Dwight, spoke with Miller about plaintiff's behavior. Miller allegedly told Lohman that plaintiff became very angry when he saw the entries on her calendar had been crossed out. Miller said that plaintiff demanded that she page Biller, stating that he would "kick his ass." When Miller refused, plaintiff allegedly asked for Biller's home address so that he could "throw a brick through his window." Miller also told Lohman that plaintiff hung his own calendar on the door the next day and stated, "nobody better touch this calendar or else." Lohman claims Miller indicated that she was concerned about what plaintiff might do next. Lohman Aff. ¶ 2.

Plaintiff denies making any of these statements.

As a result of this incident, Lohman called Scott Price, a manager at Fed Ex, and requested a change of drivers. Price in turn asked Lohman to put his complaint in writing. Lohman then instructed Miller to summarize her concerns in a letter to Price.

The letter to Price, dated September 15, 2000, recounted Miller's complaint about plaintiff's conduct on September 12 and 13. The letter also described the second incident, which concerned a package and talk of a bomb.

Some time before the September 12, 2000, calendar incident, Droll gave plaintiff a package to ship for Church & Dwight. According to Droll, the package contained lime. Droll knew that lime will burn if it becomes wet, but the package was not labeled as hazardous. Therefore, she instructed John to keep the package safe and dry in his truck.

According to Miller, plaintiff then asked Miller if he could make a bomb out of the contents of the package.

Lohman and Miller cosigned the September 15 letter to Price. Although Lohman never witnessed any of the alleged incidents, he claims that because he supervised Miller for four years and knew her reliability and veracity, he accepted her account of plaintiff's behavior.

The letter stated:

This is a list of requested bullet items where concern has been expressed against our current Federal Express driver.

- Has always talked about firearms, bullets, and blowing people and places up including Federal Express themselves.

- Currently made threats to "kick the ass" of one of our employees for crossing off his favorite football teams games on a company calendar that he always writes on, even when he was asked not to.

- Wanted to know where that particular employee lives so he can teach him a lesson and throw a brick through his window.

- Made up a calendar for the receptionist's office to hang underneath the company calendar and said since he was no longer allowed to write on the company calendar, nobody better write on the calendar he made up for her office or else!!!!!!!

- Was very interested in hazardous material shipment he picked up one day from our office. Wanted to know what the materials official name was and if he could make a bomb out of it and exactly what it could do, as far as, blowing things up or setting things on fire with it.

- His attitude has always been a very negative one and wants everyone else in life to pay for the mistakes or choices he has made and the hand that has been dealt to him.

Defendant's Ex I.

On September 15, 2000, Price informed plaintiff that his employment was terminated. Plaintiff unsuccessfully appealed his termination through the Fed Ex three-step grievance procedure.

Plaintiff subsequently sued Fed Ex for wrongful discharge and Church & Dwight for intentional interference with a business relationship. The claim against Fed Ex has been dismissed.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

Plaintiff claims Church & Dwight, through its employees Miller and Lohman, intended to cause plaintiff to be fired by his employer, and, therefore, Church & Dwight is liable for intentional interference with a business relationship.

■ In Ohio, there are five elements for a claim of tortious interference with contract: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995).

The parties in this case do not dispute three of the five elements (existence of an employment contract; defendant's knowledge of the contract; and damages to the plaintiff). Defendant seeks summary judgment, contending that the plaintiff cannot prove the third and fourth elements (intent to cause contract's breach and lack of justification).

### Intention

■ Defendant argues that neither Lohman nor Miller intended for plaintiff to be terminated. The letter to Price, according to defendant, was simply a request for a change of drivers.

Droll has, however, submitted an affidavit which attributes a statement to Miller that plaintiff "had got what he deserved" by being fired by Fed Ex. Droll Aff. ¶ 13. A jury could find that this evidenced intent on Miller's part to have plaintiff fired.

Also, a reasonable jury could find that if Lohman and Miller only intended to request a change of drivers, less inflammatory language could have sufficed. Instead, Lohman and Miller signed a letter that stated plaintiff "always talked about blowing up people and places," wanted to know "whether he could make a bomb," and threatened that "nobody better touch his calendar or else!!!!!!!" Defendant's Ex. I.

Construing all the evidence in the light most favorable to plaintiff, there is enough evidence to send the case to the jury on the third element of an intentional interference with contract claim.

### Justification

In *Fred Siegel Co., L.P.A. v. Arter & Hadden,* the Supreme Court of Ohio held that "establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper." 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999) (citing Restatement (Second) of Torts § 767, cmt. b ("The issue is each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.")).[1]

---

1. Besides this language in *Fred Siegel,* the fourth element of the tort of intentional interference with contract is not well-defined in Ohio. In *Kenty,* the Supreme Court of Ohio professed that its five element approach is an adoption of the analysis of the Restatement (Second) of Torts, § 766, which reads:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to

In determining whether an actor's interference with another's contract is improper, the court in *Fred Siegel* adopted the approach of § 767 of the Restatement, which provides:

> In determining whether an actor's conduct in intentionally interfering with a contract . . . is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

■ Defendant argues that Lohman and Miller were acting in good faith in requesting a new driver and that Church & Dwight has a legally-protected interest in controlling access to its premises and protecting its employees from outsiders.

Thus, Lohman was justified in writing the letter, even if it led to plaintiff's termination. *See Pearse v. McDonald's Systems of Ohio, Inc.*, 47 Ohio App.2d 20, 23, 351 N.E.2d 788 (1975) (A party is justified or privileged "to purposely cause another not to perform a contract with a third party where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract.").

Under the factors provided in *Fred Siegel* and § 767, however, there is a question of fact whether Lohman and Miller's conduct was improper.

The first factor, the nature of the actor's conduct, "is a chief factor in determining whether the conduct is improper or not." Restatement § 767 cmt. c. Wrongful means will subject their users to liability "even though [they] are free to accomplish the same result by more suitable means." *Id.*

Plaintiff argues Miller misrepresented and exaggerated in the September 15 letter. As evidence, plaintiff provides the affidavit of Droll, which states:

the other from the failure of the third person to perform the contract.

This section, however, does not mention "justification." When "justification" is discussed in the comments and introductory note, it is only to discuss the problems with its use as a defense.

As Justice Cook explained in her dissent in *Fred Siegel*:

> The introductory note discusses the alternative word choices for the test, including the word "justification," and concludes by stating that "the word adopted for use in this Chapter, neutral enough to acquire a specialized meaning of its own for the purposes of the Chapter, is 'improper.'" The comments explain the confusion that can result by using the language "without justification" in the test because the question then becomes "who has the burden to prove what?" The *Kenty* court added an element not contained in the recommended

language of the Restatement and unfortunately distorted the proper test. . . . The Restatement does not require either party to a tortious-interference-with-contract action to prove justification or a lack thereof. Instead, it requires that the plaintiff prove improper interference. According to the Restatement, a party may interfere with a contract, and as long as the interference is not improper, no tort has been committed. "Justification" is simply not an accurate term for the element required.

*Fred Siegel*, 85 Ohio St.3d at 188, 707 N.E.2d 853 (Cook, J., dissenting).

Because the "lack of justification" element is not well-defined by Ohio courts and because the Supreme Court of Ohio has instructed courts to look to the Restatement for guidance with Ohio's test, this court will adopt the approach that the "lack of justification" element means that the interference was "improper."

My discussion with John and Dana that day left me with the impression that Dana did not think the incident was a big deal. I never heard John threaten Bill Biller in any manner. Nor did Dana tell me on that day about any threats. John simply came in with his homemade schedule and taped it to Dana's door without any complaints from Dana. Nor did John threaten anything if anyone wrote on his hand-written calendar.

Droll Aff. ¶ 11.

Concerning the plaintiff's alleged talk of a bomb, Droll stated: "At no time did John mention the word 'bomb' to me, nor did I ever hear John use that word with Dana, with regard to this package of lime." *Id.* at ¶ 8.

Droll further testified:

[D]uring the entire period of our regular contact, for more than five years, John never once did or said anything that made me believe he was a threat to anyone or anything. During none of those discussions about firearms did John ever threaten to use a weapon against another person or thing.

*Id.* ¶ 3.

Finally, concerning the letter to Fed Ex, Droll explained: "I learned either Friday September 15, 2000 or the next Monday that Fed Ex fired John based on a complaint it had received from Dana. I was shocked because Dana did not appear to be at all upset with John concerning the calendar incident a few days before."*Id.* at¶ 12.

"A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient." Restatement § 767 cmt. c. Believing Droll's testimony as true, the September 15 letter could misrepresent, mischaracterize, or exaggerate plaintiff's statements and actions. Certainly, if the underlying allegations are disputed, so that a jury could find them to be false, or at least as casting the plaintiff in a false light, it is a question whether Lohman and Miller's actions were improper.

Thus, defendant may have been justified in informing Fed Ex of the situation, but the issue whether an interference is improper "is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." Restatement § 767 cmt. c.

Under the second factor of the Restatement test, "[i]n determining whether interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations." *Id.* Droll has stated that Miller professed that plaintiff "had got what he deserved" by being fired by Fed Ex. Therefore, Miller's motive may have been to persuade Fed Ex to terminate plaintiff, which the jury could find to have been improper.

Because there is a question of fact concerning whether plaintiff can prove the intent and the justification elements of a tortious interference with contract claim, defendant's motion for summary judgment shall be denied.

## CONCLUSION

It is, therefore,

ORDERED THAT

Defendant's motion for summary judgment be, and hereby is, denied.

So ordered.