DEBOER STRUCTURES (U.S.A.) INC., et al., Plaintiffs,

v.

SHAFFER TENT AND AWNING CO., et al., Defendants.

No. 2:00–CV–615.

United States District Court, S.D. Ohio, Eastern Division.

Sept. 23, 2002.

William H. Prophater, Jr., Lane, Alton & Horst, D. Wesley Newhouse, II, Lane, Alton & Horst, Columbus, OH, John M. Murphy, William L. Schaller, William J. Dorsey, Baker & McKenzie, Susan D. Newman, Chicago, IL, for plaintiffs.

Richard J. Seryak, Miller, Canfield, Paddock & Stone, PLC, Detroit, MI, Michael V. Kell, Kell & Lynch, Birmingham, MI, Michael A. Snyder, Conklin, Murphy, Conklin & Snyder, Chicago, IL, Robert Harrod Willard, Reminger & Reminger Co., L.P.A., Eugene Louis Matan, Matan, Geer & Wright, Columbus, OH, Clarence

Pozza, Jr., Leland D. Barringer, Kristen L. Isaacson, Miller, Canfield, Paddock & Stone, Detroit, MI, for defendants.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of the Motions for Summary Judgment filed by Defendant Pappas (Doc. # 137), by Defendant Shaffer Tent & Awning Co. (Doc. # 138), by Plaintiffs DeBoer Structures (U.S.A.) Inc., *et al.*, (Doc. # 139) and by Defendant Truxell (Doc. # 140). For the reasons that follow, the Defendants' motions are granted as to the Ohio Trade Secrets Act claims only; the motions are denied in all other respects. Plaintiffs' motion is denied.

### I.

Plaintiffs DeBoer Structures Inc., U.S.A., DeBoer Structures Inc., UK and DeBoer Structures BV International [collectively referred to as "DeBoer"] bring this action against former employee William Woodward for breach of fiduciary duty (Count I of Plaintiffs' Amended Complaint) arising from Woodward's actions in connection with his acquisition of Defendant Shaffer Tent and Awning Company ["Shaffer"], an Ohio corporation. Also named as Defendants are Theodore G. Pappas, former President and controlling shareholder of Shaffer; Linda C. Truxell, an attorney who assisted in the sale of Shaffer; and 21St Century Productions, Inc., a Michigan corporation formed by Defendants Woodward and Truxell to acquire Shaffer. Plaintiffs assert claims against these Defendants for conspiracy to breach fiduciary duties (Count II); fraud (Count III); conspiracy to defraud (Count IV); violation of the Ohio Trade Secrets Act, R.C. § 1333.61 (Count V);tortious interference with contract (Count VI); tortious interference with prospective economic advantage (Count VII); and breach of joint venture (Count VIII). The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Following a lengthy hearing, this Court previously granted a preliminary injunction in favor of the Plaintiff. The following facts were established at the hearing or in later evidentiary submissions of the parties in connection with the various motions for summary judgment.

DeBoer, whose business is based in the Netherlands, is the leading manufacturer and supplier of temporary structures, or large tents, used at significant sporting, social and cultural events around the world. At the time of the preliminary injunction hearing, Mr. Klaas DeBoer was the CEO of DeBoer Investments BV, which owns all stock in the various DeBoer affiliates. Among the structures manufactured and supplied by DeBoer are large tents used to accommodate professional golf tournaments. DeBoer supplied structures to the PGA Tour in Europe in 1998 and 1999.

In 1996, DeBoer began exploring the potential for entry into the North American structures market. DeBoer provided structures for the 1996 Olympic Games in Atlanta, Georgia and opened a United States office in Atlanta that year. William Woodward, an employee of DeBoer U.K., was DeBoer's International Sales Director from October 1991 to March 1999. In this capacity, Woodward was responsible for exploring potential acquisitions and joint ventures for DeBoer in North America. In July 1998, Woodward informed Klaas DeBoer that Shaffer, the leading supplier of tents for the PGA Tour in the United States, was for sale. Woodward informed DeBoer that he would prepare a report on the potential acquisition.

Woodward provided DeBoer with an International Sales Report on July 28, 1998. The report detailed DeBoer's activity in

various world markets, including the United States. In the report, Woodward provided a detailed analysis of the potential benefits to be derived from a venture with or purchase of Shaffer. Woodward described Shaffer as a "company of long standing,"[1] owned by Pappas and his stepson, Steve Spalding. Woodward stated that Pappas, at the age of seventy, "feels that now is the right time to sell his company with the major asset being the PGA Tour work ...." Woodward noted that while the PGA desires a more European style structure for tournaments in the United States, Pappas is reluctant to enter into such a significant investment in new equipment at his age. According to Woodward, the PGA was committed to Shaffer Sports and would not likely move the business to a European company. According to Woodward, the head of the PGA preferred that Shaffer work with a European partner with a gradual phasing out of Shaffer style equipment. In his report to DeBoer, Woodward concluded that DeBoer could enter into a purchase agreement with Shaffer over a five year period at a price of eight to ten million dollars.[2]

Unbeknownst to Klass DeBoer, Woodward had earlier expressed to Pappas his desire to purchase Shaffer. Woodward had met with Pappas in the United States on July 10, 1998 for the purported purpose of determining whether DeBoer could acquire Shaffer.

While en route to the July 10, 1998 meeting, Woodward met Truxell on an airplane on July 9, 1998. According to Woodward, he told Truxell of the DeBoer business engagement and invited Truxell to the July 10 meeting to "take notes." The July 10 meeting included Pappas, Woodward, Truxell, and PGA Tour Executives Hardwick, Hughes and Goring. At the meeting, Woodward learned of the PGA's interest in European style structures. According to Woodward, Mr. Hughes was highly impressed with the structures made by DeBoer. Following the meeting with the PGA executives, Woodward and Truxell met separately with Pappas. Woodward told Pappas that if DeBoer did not want to purchase Shaffer, he would be interested in the purchase. Truxell testified that she was aware of Woodward's intention.

While Woodward prepared the July 28, 1998 report for DeBoer regarding DeBoer's possible acquisition of Shaffer, he continued to speak with Truxell about his own individual desire for the purchase. By August 1998, Woodward and Truxell communicated to Pappas that they would purchase Shaffer for 7.5 million dollars. According to Woodward, he informed Klass DeBoer in July 1998 of his intent to purchase Shaffer in the event that DeBoer did not. According to Klass DeBoer, Woodward did not inform him of his desire to purchase Shaffer until March 1999.

On August 6, 1998, Woodward met with Pappas, Truxell[3] and PGA Tour executives. The PGA representatives informed Woodward that it intended to solicit bids for a five year contract estimated at between thirty-seven to forty million dollars. The PGA also expressed to Woodward its desire for DeBoer's European style structures. Following the meeting, Woodward

---

1. Pappas purchased Shaffer, which is headquartered in Coshocton, Ohio, in 1966. Shaffer began supplying tents for golf tournaments in 1972. In the 1980s, Shaffer began a longstanding business relationship with the PGA. Pappas testified at the preliminary injunction hearing that 99% of Shaffer's revenue is derived from PGA tour proceeds.

2. Woodward failed to disclose that he could buy Shaffer for $7,500,000. (Preliminary Injunction Hearing Transcript at 48–49).

3. On July 10, 1998, Pappas retained Truxell to act as counsel in regard to the sale of Shaffer.

prepared a report dated August 14, 1998 and entitled "DeBoer/Shaffer Sports" "Acquisition and Future." In the report, Woodward addressed the PGA's preferences and the anticipated bidding process as well as various options for DeBoer, including the possibility of purchasing Shaffer over a three to five year period, or contracting with Shaffer to service the PGA tour's needs. The report makes no mention of Woodward's individual efforts to purchase Shaffer.

Prior to his report, on August 9, 1998, Woodward prepared some notes for Truxell regarding "The New Co.," *i.e.*, the business Woodward intended to form to acquire Shaffer. Woodward testified that he did not disclose his notes to Klaas DeBoer. On the same date, Truxell faxed to Woodward various pages from her law school text on corporations regarding the fiduciary duty of loyalty owed by an agent or employee to his or her employer. Truxell expressed a concern that their discussions remain confidential.

On August 11, 1998, Truxell faxed to Woodward a "Proposal to buy Shaffer Sports" which included Woodward and Truxell obtaining shares of Shaffer. Woodward testified that he understood that in order to obtain the financing to purchase Shaffer, the PGA bid contract would have to be issued and the PGA would have to be assured that it would receive the European style structures it desired.

On August 25, 1998, Klass DeBoer sent a letter to Woodward complimenting him on the August report and concluding that DeBoer would like to join with Shaffer Sports on a short term basis. DeBoer desired to take over Shaffer Sports by first going into a "pre-marriage stage for the 1st year" followed by due diligence and ultimately a take over. DeBoer hoped to move fast in an attempt to enter the American market. The DeBoer Board did not want to purchase Shaffer outright in August 1998. According to Woodward, Pappas was not interested in the "pre-marriage" arrangement proposed by DeBoer.

On August 27, 1998, Pappas, on behalf of Shaffer, and Woodward, on behalf of DeBoer, entered into a "Cooperation Agreement." The agreement states that its purpose is to "jointly provide equipment and services to the PGA Tour Championship Management upon the successful award of a multi-year multi-tournament contract . . . ." The agreement stated that both parties agree to jointly provide the tentage, equipment, design and services for a period of three years commencing in January 1999.

On August 27, 1998, Shaffer and DeBoer submitted a bid to the PGA Tour for a three year period commencing in 1999. The bid notes that "a Shaffer/DeBoer partnership will guarantee Championship Management the Quality and distinctive look you want to acquire." Woodward testified that Shaffer and DeBoer worked together to prepare the bid submission. Truxell testified that the bid was prepared with the anticipation that if Shaffer did not have the equipment to fulfill the agreement, it could lease the same from DeBoer. On October 16, 1998, the PGA tentatively accepted the bid proposal by "Letter of Agreement." The agreement was signed by Paul Hardwick on behalf of the PGA; Ted Pappas on behalf of Shaffer; and Bill Woodward on behalf of DeBoer. On October 26, 1998, Klaas DeBoer wrote to Pappas expressing congratulations on the "Letter of Agreement" which "had been awarded to Shaffer Sports with DeBoer in support." Klass DeBoer wrote a similar congratulatory letter to Mr. Hardwick of the PGA.

Prior to this time, Truxell and Woodward continued discussions regarding their possible acquisition of Shaffer. In particu-

lar, on September 1, 1998, Truxell noted her thoughts on the possible share structure for the "new company." Woodward testified that he did not provide this information to Klaas DeBoer because, according to Woodward, and denied by Klaas DeBoer, DeBoer knew in July 1998 of Woodward's intention to buy Shaffer. Also during September 1998, Woodward and Truxell prepared a reported entitled "A Sleeping Beauty: Shaffer Sports Events, the Acquisition and the Awakening" to circulate to potential investors in order to generate capital for the new company. Woodward testified that the report was not disclosed to Klass DeBoer.

In October 1998, Woodward and Truxell formed 21st Century Productions—the new company that would acquire Shaffer. On October 1, 1998, Woodward executed an Option Agreement with Steve Spaulding pursuant to which Woodward would have a right of first refusal to purchase Spaulding's 48 shares of Shaffer stock. The agreement was contingent upon Shaffer securing a PGA contract. Spaulding testified that he did not inform Pappas, the PGA tour or DeBoer of this agreement. On October 14, 1998, Woodward and Truxell executed an Agreement regarding their acquiring a controlling interest in Shaffer. Woodward testified that DeBoer was never privy to this document.

On October 19, 1998, Pappas, on behalf of Shaffer, and Woodward, on behalf of DeBoer, executed a "Cooperation Agreement" similar to the one earlier signed in August 1998, with the exception that the October agreement stated that DeBoer will make their equipment available for the performance of the PGA Agreement either as "an owner, partner or supplier" of Shaffer throughout the life of the contract. In addition, the October Cooperation Agreement provides for a five year, rather than a three year term.

Klaas DeBoer testified that he never was given a copy of this agreement and learned of it for the first time in 1999. According to Klaas DeBoer, it was not his intent to act as a mere supplier to the PGA tour. Rather, he wanted a direct relationship with the PGA. Further, according to DeBoer, Woodward never presented the agreement as an arrangement in which DeBoer acted as only a supplier to Shaffer.

On October 30, 1998, Woodward sent some notes to Pappas reiterating that if Pappas "ma[d]e waves to the PGA ... [he would] end up with a Shaffer/DeBoer contract from the PGA which in hard terms means you don't have a company to sell, for by the end of the 5th year DeBoer will be in control." Woodward urged Shaffer to remain quiet and wait for the contract to be issued in the name of Shaffer Sports Events alone.

On November 8, 1998, Ted Pappas sent some written notes to Truxell expressing concern over Woodward's ability to acquire Shaffer if the PGA contract were issued in the name of Shaffer/DeBoer. Truxell responded to Pappas' concern by stating that Shaffer has a five year cooperation agreement with DeBoer under which DeBoer is to provide equipment for the PGA Tour contract. According to Truxell, the agreement did not have any relation to Woodward buying Shaffer. Truxell stated that if the PGA contract were issued jointly to DeBoer and Shaffer, the value of Shaffer would be "greatly reduced." Truxell directed Pappas as to how to proceed in discussions with Paul Hardwick of the PGA. In particular, Truxell told Pappas to make sure that the contract would be issued in Shaffer's name alone and to tell Hardwick that DeBoer would not be interested in a joint contract. Truxell further directed Pappas that, if Hardwick was not receptive, Woodward could speak to him

and reiterate that DeBoer would not want a joint contract.

According to Woodward, Klaas DeBoer was not interested in joint contracts. Woodward acknowledges, however, that DeBoer never told him that he did not want to be a party to the PGA Tour contract.

On December 10, 1998, Woodward sent a list of thoughts for Pappas to consider in advance of "the upcoming visit by the DeBoers" on December 11–12, 1998. He noted that when the DeBoers visit, Woodward would be wearing his "DeBoer hat." Woodward reiterated to Pappas that Klaas DeBoer wanted a long term contract, while Woodward and Pappas should bargain for a tournament by tournament deal. Woodward urged Pappas to suggest a "rolling contract" with DeBoer. Pappas did not inform DeBoer of the possibility that Woodward would acquire Shaffer.

On December 4, 1998, Pappas had written some notes for Woodward indicating that he was very uncomfortable about this visit from Klaas DeBoer because "I don't like lying to him and/or playing games with him. I've tried to be honest all my life and I hate to start telling lies now." (Exhibit 31 attached to *Plaintiffs' Motion for Summary Judgment*). Klaas DeBoer met with Pappas and Woodward in Coshocton, Ohio in December 1998. DeBoer testified that he told Pappas of his desire to acquire Shaffer after one year. Pappas informed DeBoer of the PGA's desire for 900 square foot, six-sided style tents. DeBoer stated, however, that he was only willing to manufacture 900 square foot, four sided tents.

On January 2, 1999, Woodward, acting on behalf of DeBoer, sent a fax to Pappas regarding Klaas DeBoer's intentions with respect to providing equipment for Shaffer and the PGA tour on a tournament by tournament basis. On January 4, 1999, Woodward sent a personal fax to Pappas suggesting the "style of reply" to Woodward's own fax. In essence, Woodward was advising Pappas as to how he should bargain with Woodward's current employer. Pappas testified that he did in fact use some of Woodward's suggestions.

On January 28, 1999, Shaffer, through Linda Truxell, made a presentation to representatives of the PGA Tour. Pappas was present at the meeting but Woodward was not. Pappas' notes, prepared for his presentation to the PGA representatives, reflect that DeBoer "declined to buy Shaffer" but agreed to supply equipment. Pappas' notes conclude by stating that Woodward was very apologetic for DeBoer's actions in regard to Shaffer and as a result, he would resign from DeBoer to live in the United States, run Shaffer and work with the PGA.

On February 28, 1999, Shaffer and the PGA executed the actual contract for tents to be used on the tour. DeBoer was not a party to the agreement. The original bid proposal was submitted by *both* Shaffer and DeBoer. Woodward testified that he could obtain bank financing to purchase Shaffer only if the contract was let to Shaffer and not to DeBoer and Shaffer.

On March 2, 1999, during a DeBoer International Sales meeting, Woodward informed Klaas DeBoer that he had purchased Shaffer for 7.5 million dollars. According to DeBoer, he was "flabbergasted" by Woodward's purchase of Shaffer. He did, however, prepare some calculations with respect to the 7.5 million dollar purchase price. DeBoer terminated Woodward on March 3, 1999, but wanted to maintain some form of a relationship with him in order for DeBoer to deal with the PGA.

On March 4, 1999, Pappas sent a letter to Klaas DeBoer informing him that Woodward had an option until March 1, 1999 to close the purchase. Woodward

had asked for an extension which Shaffer refused. Pappas noted that DeBoer was always the "best way" for Shaffer to go, and, until the papers with Woodward were signed, Shaffer was still for sale for ten million dollars. On March 5, 1999, Pappas faxed Shaffer's financial statements to De-Boer. According to Klass DeBoer, from July 1998 to March 1999, he had no contact with anyone at the PGA Tour about the sale of Shaffer because Woodward had been entrusted with negotiations in that regard.

On May 18, 1999, Klaas DeBoer congratulated Pappas on the sale of Shaffer Sports to Woodward and expressed enthusiasm for working with Shaffer and the PGA in the future. In the months that followed, DeBoer supplied tents for Shaffer's use for the PGA events. Shaffer claims, however, that DeBoer breached its obligations in this regard by failing to supply the style of tents required for particular tour events. DeBoer claims that any failure on its part was negated by Shaffer's earlier breach of the joint venture agreement. The Court will consider the merits of the parties' positions, below.

## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed.R.Civ.P. 56(c); this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts.' "

*Id.* (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III.

### A. Defendant Pappas' Motion for Summary Judgment

Defendant Pappas seeks summary judgment on the following claims asserted by Plaintiffs: conspiracy to breach fiduciary duties (Count II); fraud (Count III); conspiracy to defraud (Count IV); violation of the Ohio Trade Secrets Act (Count V); tortious interference with contract (Count VI); and tortious interference with prospective economic advantage (Count VII). The Court will consider each claim, *seriatim.*

#### 1. Conspiracy to Breach Fiduciary Duties

Plaintiffs allege that Defendant Pappas, together with Defendants Truxell and 21st Century Productions, conspired to further Woodward's breach of fiduciary duties owed to Plaintiff DeBoer. In particular, Plaintiffs claim that "[a]t all relevant times, Defendants knew that Woodward owed Plaintiffs fiduciary duties of trust, confidence, loyalty, full disclosure and good faith" but the Defendants "assisted Woodward in breaching his fiduciary duties and concealing Woodward's wrongful conduct from Plaintiffs." (*Amended Complaint* at ¶¶ 98–99).

■ In Ohio, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Gosden v.*

*Louis,* 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (1996) (internal citations and quotations omitted). In order to succeed on a civil conspiracy claim, an underlying unlawful act must be shown. *Minarik v. Nagy,* 8 Ohio App.2d 194, 195, 193 N.E.2d 280 (1963). The requirement of malicious combination to injure "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden,* 116 Ohio App.3d at 219, 687 N.E.2d 481. In proving this element, " 'it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design.' " *Id.,* quoting *Pumphrey v. Quillen,* 102 Ohio App. 173, 178, 141 N.E.2d 675 (1955). As to the element of malice, it is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* at 219, 141 N.E.2d 675. The element of "in a way not competent for one alone" means that "if one person could lawfully commit an act, then the act committed by two or more persons cannot support a conspiracy claim." *Id.* at 220, 141 N.E.2d 675. In other words, a claim for civil conspiracy requires an underlying wrongful act.

■ As to the element of actual damages, "this simply restricts the measure of recovery for a conspiracy claim to those damages caused by the underlying tort (or torts) necessary to support the claim for civil conspiracy in the first place." *Id.* The Plaintiff need not show any damages above those that resulted from the underlying tortious conduct.

■ Pappas contends that he cannot be held liable for civil conspiracy because he owed no duty to DeBoer to disclose Woodward's conduct. The civil conspiracy claim does not, however, require the existence of a duty on the part of the alleged

co-conspirator. *See Williams v. Aetna Finance Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998). Rather, there must simply be evidence of a common understanding or design to commit an unlawful act. In this case, there is sufficient evidence to support Plaintiffs' claim that Pappas engaged in such a common design or plan to breach Woodward's fiduciary duties. Thus, Pappas' motion for summary judgment on the civil conspiracy claim is denied.

### 2. Fraud and Conspiracy to Defraud

Plaintiffs allege that Defendant Pappas engaged in fraud against DeBoer by failing to inform DeBoer of Woodward and Truxell's plan to deprive DeBoer of the PGA Tour contract. Plaintiffs also allege that Pappas acted in furtherance of the fraud by: (1) assisting Woodward in scripting communications to DeBoer to conceal the plan to exclude DeBoer from the PGA Tour contract; (2) representing to DeBoer that the PGA wanted a 3 year rolling contract rather than a 5 year joint contract with Shaffer and DeBoer; and (3) informing Woodward of his aversion to lying to DeBoer. (*Memorandum contra* at 8).

In seeking summary judgment, Pappas contends that he owed no duty to disclose Woodward and Truxell's plan to DeBoer. Plaintiffs argue that Pappas' obligation to disclose arises from his relationship as a joint venturer with DeBoer under the August 27, 1998 "Co–Operation Agreement." The agreement was executed between the parties to place a joint bid on the PGA Tour contract. In October 1998, the PGA accepted the August 27, 1998 joint bid.

A cause of action for common law fraud requires a showing of the following: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at issue; (3) made falsely with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowl- edge can be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) injury proximately caused by the reliance. *Burr v. Board of County Commissioners of Stark Co.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (syllabus).

In its prior *Opinion and Order*, this Court concluded that Plaintiffs were unlikely to succeed on their fraud claim against Defendant Pappas to the extent that Pappas' duty to disclose arose from his position as seller of Shaffer. (*See Opinion and Order*, Dec. 11, 2001 at 20). The Court did not, however, consider Pappas' obligations in his purported capacity as joint venturer with DeBoer.

A joint venture is a "contractual association in which the parties intend to carry out a common business purpose." *Nilavar v. Osborn*, 127 Ohio App.3d 1, 18, 711 N.E.2d 726 (1998). Parties engaged in such a relationship owe each other fiduciary duties. The joint venture relationship "imposes a duty of full disclosure between the fellow venturers.... It also imposes a duty against self-dealing or secret advantage." *Id.* (citations omitted).

The evidence presented supports Plaintiffs' contention that Pappas and De-Boer were engaged in a joint venture for purposes of acquiring the PGA Tour contract. If follows that, as a party to the joint venture, Pappas owed fiduciary obligations to DeBoer, including the duty of full disclosure. As Plaintiffs point out, there is ample evidence to support the assertion that Pappas failed to disclose material facts regarding the acquisition of the PGA contract with DeBoer. Thus, summary judgment in favor of Pappas on the fraud claim must be denied.

The Court also concludes that summary judgment on the conspiracy to defraud

claim is inappropriate. The Court earlier found it unlikely that Plaintiffs would succeed on this claim since it was to Pappas' advantage to maintain a good relationship with DeBoer. The Court observed that, as late as March 1999, Pappas informed DeBoer that Shaffer could be purchased for ten million dollars. Further, Pappas was certainly aware of the PGA's desire to acquire the European-style tents, which DeBoer could manufacture. (*See Opinion and Order*, Dec. 11, 2001 at 21).

The Court did not, however, address Pappas' acts arising from his capacity as a joint venturer to acquire the PGA Tour contract. The evidence presented indicates that Pappas engaged in acts to preclude DeBoer from obtaining the PGA contract. In particular, after signing the Co-Operation agreement in August 1998, Pappas entered into a new agreement, with Woodward acting on DeBoer's behalf, but contrary to his interests, in October 1998. The October agreement provided for the possibility of DeBoer acting as a mere supplier to Shaffer. At the Preliminary Injunction hearing, DeBoer testified that he was unaware of the October 1998 agreement. Further, in negotiating with the PGA, Pappas used various suggestions by Woodward that served to DeBoer's disadvantage. In sum, the Court cannot conclude that the Plaintiffs have not created at least a genuine issue of material fact.

### 3. Ohio Trade Secrets Act

■ Plaintiffs claim that Defendant Pappas violated the Ohio Trade Secrets Act, R.C. § 1333.61, by receiving confidential DeBoer documents from Woodward regarding DeBoer's desire to acquire Shaffer as well as DeBoer's desire to form a long term relation with the PGA Tour. The documents at issue are the July 28, 1998 and August 14, 1998 reports prepared by Woodward, which he then presented to the DeBoer Board of Directors.

The July 28, 1998 report, entitled "DeBoer/Shaffer Sports—Acquisition and Future," outlines the objectives of DeBoer and Shaffer as well the benefits to be gained by their association. The report proposes options for acquiring Shaffer and entering into a relationship with the PGA. The August 14, 1998 report, also entitled "DeBoer/Shaffer Sports—Acquisition and Future," provides a more detailed analysis of the PGA's needs and the possibility of DeBoer buying-out Shaffer. (Exhibits 8 and 14 attached to *Plaintiffs' Motion for Summary Judgment*). Plaintiffs contend that the contents of these reports amount to trade secrets under Ohio law.

R.C. § 1333.61 defines "trade secret" in the following manner:

(D) 'Trade secret' means information, including the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C. § 1333.61(D).

■ In order to establish a claim for misappropriation of trade secrets, the Plaintiff must show that the information constitutes a trade secret and that the same was misappropriated. Evidence of trade secret is shown by facts demonstrating the extent to which the information is known outside the business and the pre-

cautions that Plaintiff has taken to guard the secret nature of the information. *Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 208, 759 N.E.2d 869 (2001). Whether information qualifies as a trade secret is ordinarily "a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999) (syllabus).

"Misappropriation" is defined at R.C. § 1333.61 as any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

R.C. § 1333.61(B). For purposes of the statute, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." R.C. § 1333.61(A).

The Court concludes that Plaintiffs have not come forward with any evidence to demonstrate a genuine issue of material fact on the issue of trade secret. While there is evidence that the two reports constitute business plans that would not be generally known to others, there is no evidence to demonstrate that Plaintiffs took measures to guard the secrecy of the information contained in the reports, an essential element of the Ohio Trade Secrets Act. Even if, however, the information in the two reports constitutes trade secrets, there is no evidence to demonstrate that Pappas misappropriated the same. It is undisputed that Woodward acted as DeBoer's agent at the time the reports were created and revealed to Pappas. Therefore, it cannot be said that Woodward acquired the information contained in the reports by improper means. Further, it cannot be said that Pappas misappropriated the information.

In sum, the Court concludes that Pappas is entitled to summary judgment on Plaintiffs' claim under the Ohio Trade Secrets Act.

### 4. Tortious Interference with Contract and Prospective Economic Advantage

Plaintiffs allege that Defendant Pappas tortiously induced Shaffer to breach the Joint Venture Cooperation Agreement with DeBoer. Plaintiffs further allege that the Defendant Pappas tortiously interfered with DeBoer's attempts to gain economic advantage with the North American PGA Tour.

 In Ohio, the elements of a claim for tortious interference with contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) a lack of justification; and (5) resulting dam-

ages. *Fred Siegel Co., LPA v. Arter & Hadden,* 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999). The Ohio Supreme Court holds that "[o]nly improper interference with a contract is actionable . . . ." *Id.* "The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relevant significance of the factors involved, the conduct should be permitted without liability despite its effect to harm another." *Id.,* quoting 4 Restatement of the Law 2d Torts, at 28, section 767. The existence of a contract is the first step towards successful proof of the claim. Whether or not a contract exists is ordinarily determined by the Court as a matter of law. *Reali, Giampetro & Scott v. Society National Bank,* 133 Ohio App.3d 844, 850, 729 N.E.2d 1259 (1999). The contract may be express or implied. *Id.*

■ Defendant Pappas contends that he is entitled to summary judgment because the Cooperation Agreement between Shaffer and DeBoer is not a contract. The agreement provides:

The purpose of this Agreement is to confirm the understanding between Shaffer Sports Events and DeBoer International to jointly provide equipment and services to the PGA Tour Championship Management upon the successful award of a multi-year multi-tournament contract as defined in the information prepared by the Parties in the Request for Proposals submitted August 27, 1998.

Upon contract award, both Parties agree to jointly undertake the terms of the contract to provide the tentage and ancillary equipment, design and engineering capabilities, labor, services and mutual support to fulfill the contract commitments for the term of the contract, commencing in January 1999 for a duration of three (3) years.

This Agreement is signed with the authority of the Board of Directors of DeBoer International by Mr. W. Woodward, International Sales Director and Mr. Ted Pappas, of Shaffer Sports Events and is valid for three (3) years from the date of the award of contract by the PGA Tournament Management.

Exhibit 21 attached to *Plaintiff's Motion for Summary Judgment.*

■ Pappas characterizes the foregoing as a mere agreement to make an agreement in the future. Plaintiffs argue that the parties intended to be bound in the event that Shaffer and DeBoer would jointly secure the PGA contract. In Ohio, for purposes of contract law, "[t]he enforceability of such an agreement depends . . . on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced. . . . If it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result." *Normandy Place Assoc. v. Beyer,* 2 Ohio St.3d 102, 105–06, 443 N.E.2d 161 (1982) (citations omitted).

The Court concludes that the terms of the Cooperation Agreement are sufficiently definite to be specifically enforced as a contract. The parties clearly manifested their intent to be bound in the event their joint bid was accepted by the PGA. Further, the parties clearly manifest the sorts of duties they would jointly undertake in performing the PGA contract. Thus, to the extent Pappas claims that, as a matter of law no contract existed, his motion for summary judgment is without merit.

■ Plaintiffs contend that Pappas tortiously interfered with the contract by furthering Woodward and Truxell's plans to acquire Shaffer. The evidence already ad-

duced supports this theory. The record demonstrates, at least for purposes of the Rule 56 motion, that by October and November 1998, Pappas negotiated with the PGA tour directly, at Truxell's behest, to secure the PGA contract in Shaffer's name alone, rather than jointly with DeBoer. Reasonable minds could conclude that Pappas' actions in this regard were not justified and caused DeBoer damage. Thus, summary judgment in favor of Pappas on the tortious interference with contract claim is not warranted.

▮ Similarly, the Court concludes that Pappas is not entitled to summary judgment on Plaintiffs' claim for tortious interference with economic advantage. The claim requires proof that "one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby." *Brahim v. Ohio College of Podiatric Medicine*, 99 Ohio App.3d 479, 489, 651 N.E.2d 30 (1994). In this case, there at least exists a genuine issue of material fact as to whether Pappas purposely caused Shaffer to discontinue the joint relationship with DeBoer to gain the PGA contract. Thus, summary judgment as to Pappas is denied on this claim.

### 5. Breach of Joint Venture

▮ Plaintiffs claim that Pappas breached the joint venture Cooperation Agreement executed between DeBoer and Shaffer on August 27, 1998. The Court concludes that this claim is viable, if at all, against Pappas in his capacity as a representative for Shaffer Sports Events. To the extent Plaintiffs seek liability against Pappas in his personal capacity, the motion for summary judgment is meritorious. Shaffer's liability is discussed, *infra*.

### 6. Plaintiffs' Request for Punitive Damages

▮ Defendant Pappas moves for summary judgment to the extent that Plaintiffs seek punitive damages on the claims asserted. In Ohio, a Plaintiff may recover punitive damages on a tort claim upon a showing, by clear and convincing evidence, that the Defendant acted with malice, aggravated, or egregious fraud. R.C. § 2315.21. The Ohio Supreme Court defines actual malice as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty* 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987) (syllabus). Whether this standard is satisfied is a question for the trier of fact. *See Buckeye Union Ins. Co. v. New England Ins. Co.*, 87 Ohio St.3d 280, 720 N.E.2d 495 (1999).

The Court concludes that resolution of Plaintiffs' request for punitive damages is premature at this juncture. The Court anticipates that the issue of punitive damages will be bifurcated from the other trial issues in this case. In the event that Plaintiffs receive a verdict in their favor against Defendant Pappas on the claims of fraud and conspiracy to defraud, the Court will revisit the issue. Defendant Pappas' motion for summary judgment on Plaintiffs' request for punitive damages is denied.

### B. Defendant Shaffer's Motion for Summary Judgment

Defendant Shaffer seeks summary judgment for the same reasons set forth by Defendant Pappas. For the reasons articulated above as to Defendant Pappas, Shaffer's motion is granted in part and denied in part.

## C. Defendant Truxell's Motion for Summary Judgment

Defendant Linda Truxell moves for summary judgment on each of the claims asserted against her, specifically: conspiracy to breach Woodward's fiduciary duties (count II); conspiracy to defraud Plaintiffs (count IV); violation of the Ohio Trade Secrets Act (count V); tortious interference with contract (count VI); and tortious interference with prospective economic advantage (count VII). The Court will consider the merits of each claim.

### 1. Conspiracy to Breach Fiduciary Duties

Defendant Truxell contends that she cannot be held liable for conspiracy to breach Woodward's fiduciary duties because she owed no duty to Plaintiffs. Truxell submits that, as an agent of Pappas and Shaffer, her only duty was to assist them in finding a buyer for Shaffer, which duty she fulfilled.

Truxell's argument is misplaced. As stated above, a claim for civil conspiracy does not require the existence of a duty on the part of the alleged co-conspirator. *See Williams v. Aetna Finance Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998). Rather, there must simply be evidence of a common understanding or design to commit an unlawful act. In this case, there is more than sufficient evidence to support Plaintiffs' claim that Truxell engaged in such a common design or plan to breach Woodward's fiduciary duties. Truxell had knowledge of the duty owed by Woodward to DeBoer. Thus, Truxell's motion for summary judgment on the conspiracy to breach fiduciary duty claim is denied.

### 2. Conspiracy to Defraud

Truxell contends that she cannot be held liable for allegedly assisting Woodward in defrauding the Plaintiffs because she owed no duty to Plaintiffs. As stated above, a claim for civil conspiracy requires a showing of "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Gosden v. Louis, supra.* Moreover, a conspiracy claim does not require the existence of a duty on the part of the alleged co-conspirator. *Williams v. Aetna Finance Co., supra.*

As this Court has earlier observed, the extensive trail of documents in this case shows that Truxell and Woodward corresponded on numerous occasions regarding their acquisition of Shaffer and the need to keep the acquisition confidential. Furthermore, the evidence demonstrates that Truxell, as an attorney, was keenly aware of the potential liability to Woodward as a result of the scheme. Nonetheless, Truxell and Woodward carried out their plan to acquire Shaffer and usurp any direct relationship between DeBoer and the PGA. In view of this evidence, Truxell's motion for summary judgment on the conspiracy to defraud claim is denied.

### 3. Violation of Ohio Trade Secrets Act

As stated above, Plaintiffs claim that the July 28, 1998 and August 14, 1998 reports which Woodward prepared for the DeBoer Board of Directors on the potential acquisition of Shaffer and attainment of the PGA contract, constitute trade secrets under Ohio law. Plaintiffs further claim that, by coming into possession of these documents, Truxell is liable under the statute for misappropriation of trade secrets.

For the reasons earlier articulated, even assuming that the two reports constitute trade secrets under the statute, there is no evidence to indicate that the reports were misappropriated. At the time the reports were created, Woodward worked for De-

Boer and was specifically engaged in evaluating DeBoer's acquisition of Shaffer and award of the PGA Tour contract. In light of Woodward's duties, there is no evidence to establish or infer that the information contained in the reports was acquired by improper means. Further, there is no evidence to conclude or infer that Truxell misappropriated the information. Thus, Truxell's motion for summary judgment on this claim is meritorious.

### 4. Tortious Interference with Contract and Prospective Business Advantage

█ Plaintiffs claim that Truxell tortiously interfered with the August 27, 1998 Cooperation Agreement executed between Shaffer and DeBoer and that she tortiously interfered with DeBoer's ability to acquire the PGA Tour contract. Truxell argues that she cannot be held liable because as Shaffer's agent, she could not have tortiously interfered with a contract to which Shaffer was party.

█ Truxell's theory is misplaced. As Plaintiffs point out, a corporate agent generally cannot be held liable for interference with a contract to which the corporation is a party, unless there is evidence that the agent acted outside his or her corporate capacity. *See Dorricott v. Fairhill Center for Aging,* 2 F.Supp.2d 982, 990 (N.D.Ohio 1998). In this case, there is ample evidence to indicate that Truxell acted in her in her own interests in interfering with the Cooperation Agreement. Thus, the fact that Truxell was engaged by Shaffer to aid in the sale of the corporation does not absolve Truxell of liability.

In addition, there is sufficient evidence to support Plaintiffs' claim that Truxell tortiously interfered with the Defendant's ability to secure the PGA Tour contract. Truxell encouraged Shaffer to secure the PGA contract in Shaffer's name alone and, by encouraging Woodward's breach of duties, she acted to usurp DeBoer's opportunity to supply tents to the PGA. In sum, the Court concludes that Truxell is not entitled to summary judgment on the tortious interference with contract and prospective business opportunity claims.

### 5. Plaintiffs' Request for Punitive Damages

Defendant Truxell also seeks summary judgment on Plaintiffs' requests for punitive damages. As stated above, in Ohio, a Plaintiff may recover punitive damages on a tort claim upon a showing, by clear and convincing evidence, that the Defendant acted with malice, aggravated, or egregious fraud. R.C. § 2315.21. The Ohio Supreme Court defines actual malice as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty* 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987) (syllabus). Whether this standard is satisfied is a question for the trier of fact. *See Buckeye Union Ins. Co. v. New England Ins. Co.,* 87 Ohio St.3d 280, 720 N.E.2d 495 (1999).

The Court concludes that resolution of Plaintiffs' request for punitive damages is premature at this juncture. As previously indicated, the Court anticipates that the issue of punitive damages will be bifurcated from other trial issues in this case. In the event that Plaintiffs receive a verdict in their favor against Defendant Truxell on the tort claims, the Court will revisit the issue. Defendant Truxell's motion for summary judgment on the request for punitive damages is denied.

### D. Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment on all claims presented. The Court will consider each claim separately.

### 1. Breach of Fiduciary Duty—Defendant Woodward

Plaintiffs allege that Woodward breached his fiduciary duties, including the duty of loyalty by:

i. Using and disclosing for his own benefit, Plaintiffs' proprietary and confidential information, including but not limited [to] the business and financial analyses relating to Plaintiffs' evaluation of Shaffer, which information Woodward obtained solely by, through, and as a result of his fiduciary relationship with Plaintiffs;

ii. Negotiating to purchase Shaffer for himself while Plaintiff's fiduciary;

iii. Competing against Plaintiffs for contracts with the PGA Tour while Plaintiffs' fiduciary;

iv. Undermining Plaintiffs' October 16, 1998 Letter of Agreement, contracts, and business expectancies with Shaffer and with the PGA Tour;

v. Disparaging and defaming Plaintiffs while Plaintiffs' fiduciary;

vi. Failing to disclose his self-dealing to Plaintiffs and otherwise making false representations to Plaintiffs to conceal his fiduciary breach;

vii. Failing to disclose to Plaintiffs his intent to purchase Shaffer; and

viii. Otherwise acting in direct conflict of interest with Plaintiffs.

*Amended Complaint* at ¶ 95.

In Ohio, "a fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtues of this special trust." *Anchor v. O'Toole,* 94 F.3d 1014, 1023 (6th Cir.1996) (internal quotation marks and citation omitted). It is well-established that a corporate officer occupies a fiduciary relationship to his or her employer and that this relationship imposes upon the officer a number of duties, including "good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure." *Wing Leasing, Inc. v. M & B Aviation, Inc.,* 44 Ohio App.3d 178, 181, 542 N.E.2d 671 (1988). In considering whether the fiduciary has breached one or more of these duties, intent is not relevant; rather, "as long as the [fiduciary] places himself in a position of conflicting loyalties and subsequently violates his duty of trust and benefits at the expense of the corporation, liability attaches." *Ohio Drill & Tool Co. v. Johnson,* 625 F.2d 738, 742 (6th Cir.1980).

This Court earlier concluded that the evidence presented supported Plaintiffs' claim that Woodward engaged in various acts of self-dealing to the detriment of his principal, DeBoer. The Court held that, as a result, the burden is upon Woodward to show that the transactions were fair to DeBoer. (*See Opinion and Order,* December 11, 2001 at 15). Woodward acknowledges this burden in opposing Plaintiffs' motion for summary judgment.

Woodward contends that genuine issues of material fact exist on the breach of fiduciary duty claim. In particular, Woodward argues that he fully disclosed his interests in Shaffer to Klaas DeBoer in August 1998. DeBoer, however, claims that he was unaware of Woodward's interest until March 1999. While this Court earlier observed that it found DeBoer more credible and the absence of written corroboration of Woodward's claims to be persuasive, the Court cannot make the same conclusion at this juncture in the action. Findings made by the Court under Fed.R.Civ.P. 65 may involve determinations of credibility; no such decision making authority is given to the Court under Fed.R.Civ.P. 56. The evidence reveals a genuine issue of material fact that must be presented to a jury for final determination. Thus, Plaintiffs' motion for summary judg-

ment on the breach of fiduciary duty claim is denied.

## 2. Fraud

Plaintiffs allege that Woodward breached his duty to speak to Plaintiffs by concealing the following:

i. His disclosure, for his own benefit, of Plaintiffs' proprietary and confidential information, including but not limited [to] the business and financial analyses relating to Plaintiffs' evaluation of Shaffer;

ii. His negotiations to purchase Shaffer for himself;

iii. His competition against Plaintiffs for contracts with the PGA Tour;

iv. His efforts to undermine Plaintiffs' October 16, 1998 Letter of Agreement, contracts, and business expectancies with Shaffer and with the PGA Tour;

v. His disparagement and defamation of Plaintiffs;

vi. His self-dealing; and

vii. His intent to purchase Shaffer.

(*Amended Complaint* at ¶ 103). Plaintiffs further allege that Woodward, Shaffer and Pappas

made the false statements to DeBoer, including those described above, to (1) induce DeBoer not to make a bid on the PGA Tour Contract for itself (rather than with Shaffer as joint venturer); (2) to induce DeBoer not to acquire Shaffer; and (3) to otherwise conceal Defendants' scheme to usurp Plaintiffs' opportunity to acquire Shaffer and to usurp Plaintiffs' relationship with the PGA Tour.

(*Id.* at ¶ 104).

In Ohio, a cause of action for common law fraud requires a showing of the following: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at issue; (3) made falsely with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowl-edge can be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) injury proximately caused by the reliance. *Burr v. Board of County Commissioners of Stark Co.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (syllabus).

Woodward contends that Plaintiffs are not entitled to summary judgment on the fraud claims because Woodward believed in good faith that he had fully disclosed his interest in Shaffer to Klaas DeBoer. Again, while this Court earlier discredited Woodward's testimony, a jury must ultimately decide an issue on which there is conflicting evidence. Whether Woodward is credible is a material issue to the fraud claims and therefore must be considered by the trier of fact. Plaintiffs' motion for summary judgment on their fraud claim against Woodward is denied.

## 3. Conspiracy to Breach Fiduciary Duties and Conspiracy to Defraud

Plaintiffs seek summary judgment on their claim that "[a]t all relevant times, Defendants knew that Woodward owed Plaintiffs fiduciary duties of trust, confidence, loyalty, full disclosure and good faith" but the Defendants "assisted Woodward in breaching his fiduciary duties and concealing Woodward's wrongful conduct from Plaintiffs." (*Amended Complaint* at ¶¶ 98–99).

As this Court stated above, civil conspiracy requires "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Gosden v. Louis*, 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (1996) (internal citations and quotations omitted). In order to succeed on a civil conspiracy claim, an underlying unlawful act must be shown.

*Minarik v. Nagy,* 8 Ohio App.2d 194, 195, 193 N.E.2d 280 (1963).

Defendant Woodward contends that summary judgment in Plaintiffs' favor is inappropriate because genuine issues of material fact exist on the alleged underlying unlawful acts—breach of fiduciary duty and fraud. The Court agrees. It is clear that success on the civil conspiracy claims requires that Plaintiffs successfully show that Woodward breached his fiduciary duties and committed fraud against Plaintiffs. Since this Court has concluded that these underlying claims must proceed to trial, summary judgment on the civil conspiracy claims cannot be granted. Plaintiffs' motion is denied.

### 4. Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage—Defendants Woodward, Truxell, Pappas, and 21st Century

Plaintiffs seek summary judgment on their tortious interference claims as to all Defendants. This Court concluded, *supra,* that the Cooperation Agreement entered into between DeBoer and Shaffer is a contract for purposes of the tortious interference claims. Nonetheless, Defendants argue that genuine issues of material fact exist on the remaining elements of the claims.

On the claim for tortious interference with contract, the Plaintiffs must show: the existence of a contract; the wrongdoer's knowledge of the contract; the wrongdoer's intentional procurement of the contract's breach; a lack of justification; and resulting damages. *Fred Siegel Co., LPA v. Arter & Hadden,* 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999). "Only improper interference with a contract is actionable . . . ." *Id.* "The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relevant significance of the factors involved, the conduct should be permitted without liability despite its effect to harm another." *Id.,* quoting 4 Restatement of the Law 2d Torts, at 28, section 767.

Defendants contend that they did not intentionally interfere with the Cooperation Agreement. As the Court stated *supra,* although Pappas and Truxell were agents of Shaffer and Woodward was an agent of DeBoer at the time the agreement was executed, there is evidence to demonstrate that the Defendants frustrated the purpose of the agreement by engaging in self-serving acts to acquire Shaffer and to exclude Plaintiffs from the PGA Tour contract. The Defendants argue, however, that Plaintiffs had no desire to enter into a direct relationship with the PGA and that Woodward had fully disclosed to DeBoer his intent to acquire Shaffer. The Court concludes that there is a genuine issue of material fact as to whether the Defendants tortiously interfered with the Cooperation Agreement and whether they deprived Plaintiffs of a prospective economic opportunity with the PGA Tour. Consequently, the Plaintiffs' motion for summary judgment on both tortious interference claims is denied.

### 5. Violation of the Ohio Trade Secrets Act

Plaintiffs assert that they are entitled to summary judgment on their Ohio Trade Secrets Act claim as to all Defendants.

For the reasons articulated above, this Court concludes that Plaintiffs have not come forward with sufficient evidence to demonstrate a genuine issue of material fact on the trade secret claim. While the two reports prepared by Woodward regarding DeBoer's potential acquisition of Shaffer constitute business plans that would not be generally known to others, there is no evidence to demonstrate that

Plaintiffs took measures to guard the secrecy of the information contained in the reports. Further, even if the information in the two reports constitutes trade secrets, there is no evidence to demonstrate that any of the Defendants misappropriated the same. It is undisputed that Woodward acted as DeBoer's agent at the time the reports were created and revealed to Pappas. Therefore, it cannot be said that Woodward acquired the information contained in the reports by improper means. Plaintiffs' motion for summary judgment on the Ohio Trade Secrets Act claims is denied.

### 6. Breach of the Joint Venture

██ Plaintiffs move for summary judgment on their claim that Shaffer breached the August 27, 1998 joint venture agreement. Plaintiffs also seek summary judgment on Shaffer's counterclaim that DeBoer breached the agreement.

Plaintiffs argue that it is undisputed that Shaffer breached that agreement by excluding Plaintiffs from the PGA Tour contract. Plaintiffs rely on Pappas' statement that he did not want DeBoer's name on the contract, in support of their position. Plaintiffs further argue that because of Shaffer's alleged breach, any purported subsequent breach of the agreement on Plaintiffs' part was excused.

██ Shaffer opposes Plaintiffs' motion. First, Shaffer argues that the parties did not enter into a joint venture. The written agreement demonstrates the contrary. The parties clearly stated their intent to "jointly provide equipment and services to the PGA Tour Championship Management upon the successful award of a multi-year multi-tournament contract ...." (Exhibit 21 attached to *Plaintiffs' Motion*). The agreement further states that the parties "agree to jointly undertake the terms of the contract to provide the tentage and ancillary equipment, design and engineer-ing capabilities, labor, services and mutual support to fulfill the contract commitments for the term of the contract, commencing in January 1999 for a duration of three (3) years." (*Id.*). Thus, the Court finds sufficient evidence of a joint venture agreement.

Shaffer argues, however, that because the parties did not jointly share profits that no joint venture can be found. According to Shaffer, Plaintiffs acted as a mere subcontractor in supplying tents for Shaffer's use. In making this argument, Shaffer ignores the fact that DeBoer's status was arguably attributable to the fact that it was excluded from the PGA contract. Unbeknownst to Plaintiffs, the Defendants were speaking with representatives of the Tour to prevent DeBoer's name from appearing on the contract. This evidence, which Defendants dispute, creates a genuine issue of material fact as to Shaffer's alleged breach of the joint venture agreement. The evidence does not show, as Shaffer argues, that no joint venture can be found.

Assuming the existence of a joint venture agreement, Shaffer seeks relief for Plaintiffs' alleged breach of the agreement. Specifically, Shaffer claims that Plaintiffs breached the agreement by failing to supply the sort of tents required for PGA events, *i.e.*, 900 square foot Acropolis structures. Shaffer further claims that the Plaintiffs breached the agreement by failing to share expenses in supplying structures to the PGA Tour.

The Court concludes that whether Plaintiffs' alleged failures amount to a breach of the joint venture agreement must be determined by a jury. As stated above, Plaintiffs contend that Shaffer materially breached the agreement in the first instance by excluding Plaintiffs from the PGA contract. Whether Shaffer's actions constitute a material breach is a question of fact. Furthermore, whether any mate-

rial breach excuses the Plaintiffs' later purported breach is also a question of fact. *See Bradley v. Pentajay Homes,* No. CA1458, 1991 WL 122853 (Ohio App. July 3, 1991). Thus, Plaintiffs' motions for summary judgment on the claim for breach of the joint venture agreement as well as on Shaffer's counterclaim for breach of the same agreement, must be denied.

### IV.

In light of the foregoing, Defendant Pappas' Motion for Summary Judgment (**Doc. # 137**) is **GRANTED in part and DENIED in part**. Defendant Shaffer Tent & Awning Co.'s Motion for Summary Judgment (**Doc. # 138**) is **DENIED**. Defendant Truxell's Motion for Summary Judgment (**Doc. # 140**) is **GRANTED in part and DENIED in part**. Plaintiffs DeBoer Structures (U.S.A.) Inc., *et al.*'s Motion for Summary Judgment (**Doc. # 139**) is **DENIED**.

The Clerk is **DIRECTED** to remove the foregoing motions from the Court's pending motions list.

**IT IS SO ORDERED.**