OPINION
{¶ 1} Appellants, A Way of Life, Inc., Rick Lopez, and Christine E. Lopez (hereinafter collectively referred to as "Lopez"), own a hair styling salon in Ravenna, Ohio. They sued under a covenant not to compete to halt operations at a competing hair salon in Kent, Ohio. The trial court held that the covenant not to compete was not breached and that the hair salon in Kent, Ohio could continue to operate. We affirm the judgment entry of the trial court.
 {¶ 2} Appellees Kathleen S. Schulda and Wendell P. Schulda (collectively "Schuldas") sold their hair salon business to Lopez on March 4, 1999. Schuldas operated the business under the name of Sheridan's Hair Salon and Day Spa, Inc. ("Sheridan's). The sale of the business was accomplished by means of an asset purchase agreement. The agreement reflected four items being sold to Lopez: business equipment, supplies, and inventory; the name "Sheridan's" and the phone number; goodwill; and a covenant not to compete.
 {¶ 3} On the same day, Schuldas and Lopez executed a separate real estate purchase agreement for the property at 658 West Main Street, Ravenna, Ohio. In toto, Lopez agreed to pay to Schuldas for the business and the real estate the sum of $310,000.
 {¶ 4} The next day, March 5, 1999, Schuldas executed a covenant not to compete. The terms of this covenant were as follows:
 {¶ 5} "Wendell P. Schulda, Kathleen S. Schulda and Sheridan's Hair Salon and Day Spa, Inc. agree that for a period of five (5) years from the date of the closing of the sale of the real property and business at West Main Street, Ravenna, Ohio, that they will not directly or indirectly manage, operate, or participate in the ownership, management or operation of any business within a fifteen mile radius of 658 West Main Street, Ravenna, Ohio that will in any respect be in competition with the business that Sheridan's Hair Salon and Day Spa, Inc. is currently operating at 658 West Main Street, Ravenna, Ohio. It is stipulated that the business that is subject to the covenant not to compete includes hair styling, manicuring, massage and tanning services."
 {¶ 6} Shawna Martin ("Martin") is the daughter of Kathleen S. Schulda and the stepdaughter of Wendell P. Schulda. She also works in the beauty salon business. At various times, she has worked for her parents, the Schuldas, as well as for Lopez. Until Sheridan's was sold in March 1999, she was working there as well as at a beauty salon in Boardman, Ohio. In 2001, she investigated the possibility of buying a beauty salon business in Canfield, Ohio. Later that year, in August 2001, she bought the business formerly known as Nancy's V.I.P. Look, in Kent, Ohio, for $8,000. She made a down payment of $1,000 on August 20, 2001, and paid the balance of $7,000 by the required date (Sept. 15, 2001). The $7,000 balance of the purchase price came from a gift to her by Schuldas, with no strings attached.
 {¶ 7} On October 1, 2001, Martin opened her beauty salon in Kent, Ohio, within fifteen miles of the location where Sheridan's formerly operated. Her trade name for her new business was The V.I.P. Look. Her salon and Lopez' salon were in competition with each other. Within weeks of opening her salon in Kent, Ohio, seven of Lopez' stylists left the Ravenna salon and went to work for Martin in Kent, Ohio.
 {¶ 8} The record reflects that at various times Schuldas provided additional financial and other assistance to Martin for her Kent salon. For example, she used their credit card to purchase supplies for her salon; they bought furniture for the salon; they advanced monies to a handyman who did work at her salon; they paid $2,429.79 for an improvement to the salon in December 2001; they used Wendell P. Schulda's name on a building permit for salon improvements; they helped paint and clean the salon; and they paid $1,000 to a newly hired salon manager two days after opening. They also wrote three personal checks to Martin in the total amount of $5,850 within the first week of the salon opening. However, Schuldas did not execute the lease for the V.I.P. Look salon, they did not negotiate for or on behalf of Martin to purchase the V.I.P. Look salon, they derived no income from the operation of the salon, and they are not involved with the day-to-day operation of Martin's salon. The record also reflects that they made substantial cash gifts to their other children.
 {¶ 9} Lopez filed a motion for a preliminary injunction. Schuldas consented to the entry of a preliminary injunction such that they agreed not to operate, manage, or own Martin's salon business in Kent during the pendency of the case. The motion for preliminary injunction against Martin went to hearing on the issue whether Martin converted trade secrets, to wit, customer lists, for which a preliminary injunction should issue. The trial court found that the customer lists were not protected by measures reasonably calculated to safeguard them, and were, therefore, not entitled to protection otherwise accorded to trade secrets. It denied the motion for preliminary injunction against Martin for that reason.
 {¶ 10} The hearing on the merits took place before a magistrate and lasted three days. Lopez proceeded against Schuldas on the theory of a breach of contract for violating the terms of the covenant not to compete. They proceeded against Martin on the theory of tortious interference of a contract by establishing her business in concert with her parents so as to violate the covenant not to compete. The magistrate stated that liability against Martin could only be achieved if liability was first established against Schuldas: "[i]f I find that there has been no breach of contract, then [Martin] couldn't have interfered with the contract and there couldn't have been a conspiracy to breach the contract."
 {¶ 11} The magistrate's order held in favor of all the defendants on Lopez' claims. Lopez filed objections to the magistrate's order. The trial court overruled the objections, adopted the conclusions of the magistrate, and entered judgment for all the defendants. Lopez timely filed an appeal to this court from the trial court's judgment.
 {¶ 12} Lopez assigned seven assignments of error to this court for review. Four of those assignments deal with the enforceability of the covenant not to compete and will be treated together. They are as follows:
 {¶ 13} "[First assignment of error:] The trial court erred as a matter of law and abused its discretion by adopting the magistrate's decision and journal entry finding the actions of the defendant-appellees [sic] Kathleen and Wendell Schulda did not constitute a violation of the written covenant not to compete dated March 5, 1999.
 {¶ 14} "[Second assignment of error:] The magistrate and trial court erred as a matter of law in applying an unreasonable and unduly restrictive interpretation of the covenant not to compete entered into between the parties.
 {¶ 15} "[Third assignment of error:] The trial court erred by adopting the magistrate's decision to the prejudice of the plaintiff-appellants [sic] by failing to find that the check dated October 3, 2001 in the amount of one thousand dollars ($1,000.00) payable to Loretta Iarussi (plaintiff's trial exhibit 26) directly from defendant-appellee Kathy Schulda was evidence of the breach of the covenant not to compete since Loretta Iarussi, in effect, managed Shawna Martin's VIP, ordered supplies, did scheduling, etc. Said finding was an abuse of discretion and against the weight of the evidence.
 {¶ 16} "[Fifth assignment of error:] The trial court erred as a matter of law in adopting the magistrate's decision against the manifest weight of the evidence, and failing to award damages to plaintiff-appellants [sic] because the damages of lost profits were shown by reasonable certainty and to a fair degree of probability."
 {¶ 17} We review these assignments as matters of law. "The construction of written contracts and instruments of conveyance is a matter of law."[1] The parties do not seek reformation of the contract in question, so that "evidence can not be introduced to show an agreement between the parties materially different from that expressed by clear and unambiguous language of the instrument."[2] We do not find the language of the covenant not to compete to be ambiguous. The critical language in that covenant is that Schuldas will not "directly or indirectly manage, operate, or participate in the ownership, management or operation of any business" located within fifteen miles of Lopez' business and will not do so for a five-year period. The terms used therein are used in common parlance, both legal and nonlegal. Schuldas put in the record dictionary definitions for "manage" — "to direct or control the use of; handle"; "operate" — "to control the functioning of; run"; "own" — "to have or possess as property." At least one appellate court has relied on the dictionary definition of "participate": "to take part in something (as an enterprise or activity)."[3] Finding no ambiguity, we are able to construe the contract from the express language of the instrument. "The agreement of the parties to a written contract is to be ascertained from the language of the instrument, and there can be no intendment or implication inconsistent with the express terms thereof."[4]
 {¶ 18} Even though we find no ambiguity in the covenant not to compete, by its nature a covenant not to compete is a restraint on trade, is disfavored in the law, and is to be strictly construed.[5]
Accordingly, a breach of the covenant not to compete may only be found where the Schuldas acted in express violation of the covenant.
 {¶ 19} The magistrate found that:
 {¶ 20} "The covenant at issue here does not expressly prohibit the Schuldas' conduct. Because the covenant must be strictly construed, absent stronger evidence than was presented here, the Magistrate cannot find that the parties intended the covenant to prohibit the Schuldas' assistance to their daughter when they are not profiting from the business, are not managing the business, and have no ownership interest in the business."
 {¶ 21} The trial court adopted the decision of the magistrate.
 {¶ 22} Lopez argue that the judgment of the trial court was against the manifest weight of the evidence. However, we will not reverse a judgment of the trial court where there is some competent and credible evidence to support it.[6]
 {¶ 23} The evidence adduced by Lopez demonstrated that Schuldas permitted Martin to use their credit cards to purchase supplies for her salon; they donated furniture in the form of a reception desk and book shelves for her salon; they advanced money to a handyman for work performed at her salon; they paid money out their pocket for an improvement in December 2001; Wendell P. Schulda put his name on a city building permit for salon improvements; they helped paint and clean the salon to get it ready for opening; and they wrote a check to a newly hired manager who formerly worked for Lopez. They also wrote checks to Martin as gifts before and after she opened her salon on October 1, 2001.
 {¶ 24} However, Lopez adduced no evidence that Schuldas negotiated for or on behalf of Martin for the purchase of her salon; they did not put their names on the lease and did not make any rent payments to her landlord; they derived no income from Martin's salon; and they were not at all involved in the day-to-day operation of her salon. In addition, they made gifts of cash to their other children at this time.
 {¶ 25} The covenant not to compete was prepared by Lopez' attorney and is to be strictly construed against them. We believe that the judgment of the trial court is not against the manifest weight of the evidence.
 {¶ 26} As for the check for $1,000 check that Schulda wrote out to Loretta Iarussi two days after Martin opened her salon, Kathleen S. Schulda admitted that she came to work for Martin on the date of the opening, but testified that the money was a personal loan to a long-time friend. Ms. Iarussi was in financial straits from a bakery business in Kent and went to Kathleen S. Schulda for this financial assistance. The money was not intended as an inducement or bonus for her to come to work for Martin. Lopez argue that this payment is evidence that Schuldas were in breach of the covenant, but the trial court chose to believe otherwise. As the trier of fact, the court was permitted to construe this testimony in favor of Schuldas and against Lopez. This reviewing court is not going to second guess the trial court with respect to this evidence.
 {¶ 27} Finally, Lopez argue under these assignments of error that the trial court should have awarded them lost profits.
 {¶ 28} Even if we were to find that there was sufficient evidence to establish a breach of the covenant not to compete, however, the testimony adduced to support lost profits was not admissible and could not support a judgment for lost profits.
 {¶ 29} "In order for a plaintiff to recover lost profits in a breach of contract action, the amount of lost profits, as well as their existence, must be demonstrated with reasonable certainty."[7]
 {¶ 30} Mr. Wolff, Lopez' accountant, testified regarding two exhibits that he had prepared for trial. The conclusion of his testimony was that Lopez had lost $76,545 in gross profits for a fifteen-month period. When asked on cross-examination why he calculated gross profit instead of net profit for the applicable period, he said that, "[b]ecause there is a loss of revenue here that can't be overwritten, I guess. [Lopez] didn't have the availability of this $76,000 to pay other bills, to pay officers salary and that type of thing." However, this court has formerly held that, "[i]t is clear that, in general, a party seeking damages for future lost profits must demonstrate net profits and not gross profits."[8]
Further, "[d]amages which are speculative are not recoverable."[9]
 {¶ 31} The testimony of Accountant Wolff relating to gross profits was inappropriate and speculative. It did not constitute testimony on lost profits, but amounted to his own judgment as to the cash flow that Lopez lost as a result of seven hairstylists leaving Lopez' employ. For this reason, this testimony had no competence and no credibility.
 {¶ 32} The first, second, third, and fifth assignments of error are without merit.
 {¶ 33} Lopez' fourth and sixth assignments of error are as follows:
 {¶ 34} "[Fourth assignment of error:] The trial court erred as a matter of law by adopting the magistrate's decision against the manifest weight of the evidence and failing to find that the claim for tortious interference with a contract against the defendant-appellee, Shawna Martin, was established.
 {¶ 35} "[Sixth assignment of error:] The trial court erred as a matter of law by adopting the magistrate's decision against the manifest weight of the evidence, and failing to award attorney fees to the plaintiff-appellants [sic] in accordance with the provisions of the asset purchase agreement (paragraph 8) (plaintiff's trial exhibit 3)."
 {¶ 36} A claim for tortious interference with a contract must satisfy the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages."[10]
 {¶ 37} In addition, paragraph three of the syllabus of the Fred SiegelCo., L.P.A. v. Arter Hadden case adopts the language of the Restatement of the Law 2d, Torts, to further explain what is meant by the "wrongdoer's intentional procurement of the contract's breach":
 {¶ 38} "In determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties."[11]
 {¶ 39} The magistrate took the position that if there were no breach of the covenant not to compete by Schuldas, then there could be no tortious interference with the contract claim. The trial court adopted the decision of the magistrate in its judgment entry.
 {¶ 40} Allowing, however, that tortious interference with a contract is a separate cause of action and stands on its own, such that it is possible to tortiously interfere with a contract whether or not the party to the contract is in breach, we do not believe the record supports a finding of liability on the cause of action alleging tortious interference with a contract.
 {¶ 41} Referring to the Restatement of the Law factors cited in the syllabus to the Siegel case, we do not believe there is evidence in the record to satisfy any of the factors mentioned therein. While Martin admitted she knew of the covenant not to compete, she did not know its specific terms as to distance or as to time. Her testimony regarding acquiring her own salon in Kent was consistently to the effect that it was for her own benefit, and not that of her parents. She used her parents' credit cards to purchase supplies, but she testified that she paid them back in full, to the best of her knowledge. She asked her parents for money to consummate the purchase of the salon in Kent, but her testimony on this point was that she was only asking them for money because they had helped out her siblings, and that this was an opportune time to ask them for her share. There is nothing in the record to demonstrate that the assistance given by Martin's parents, both financial assistance and other assistance, was for any other reason than for parents to help out their child. They were business people who had been in business for many years, and they were trying to help out their young, ambitious daughter to succeed as they had. There is nothing nefarious in encouraging parents to do as much for their children. Further, there was no testimony concerning bad motives or animus toward Lopez. The testimony concerning the hasty exit by the seven hairstylists who went to work for Martin soon after she opened her salon in Kent was to the effect that they made they own decisions to leave Lopez' salon, and some of them offered ample reasons for doing so. Nothing in the record supports the idea that Martin orchestrated their exit to her salon.
 {¶ 42} Because we find that the trial court correctly gave judgment to Martin on Lopez' claim for tortious interference with a contract, it follows that there would be no award to Lopez for attorneys' fees.
 {¶ 43} The fourth and sixth assignments of error are without merit.
 {¶ 44} Lopez' seventh assignment of error is as follows:
 {¶ 45} "The trial court committed prejudicial error and abused its discretion in adopting the magistrate's decision, which admited [sic] into evidence the defendant-appellees' [sic] exhibits of checks written by the defendant-appellee, Wendell Schulda, to, for or on behalf of his daughter, Ms. Ritzert, (defendant's exhibits 11 through 24) (T.d. 99; T.d 105)."
 {¶ 46} At the hearing on the merits, the magistrate admitted into evidence checks that had been written to Ms. Ritzert, another child of Schuldas. Over objection to the admission of this evidence, the trial court ruled that, while such evidence may have been irrelevant to whether the Schuldas breached the covenant not to compete, it was relevant evidence bearing on the tortious interference with a contract claim. The court stated:
 {¶ 47} "The fact that Wendell Schulda gave all of his children money, and the fact that all of his children accepted the gifts tend to show that Shawna did not accept the money from her parents intending to breach the contract by such acceptance. It was the family practice to give and accept monetary gifts. Also, the evidence of the checks written to Wendell Schulda's other daughter may be relevant to the scope of the covenant not to compete. [Lopez] argue that the covenant not to compete prohibits the Schuldas' monetary assistance to Shawna. The Magistrate determined that the covenant did not cover the gifts and assistance to Shawna. The fact that the Schuldas aided all of their children is relevant to the intent of the parties when they entered the covenant. The gifts tend to show that the Schuldas did not intend the covenant to restrict gifts to their children."
 {¶ 48} The admissibility of evidence is a matter of discretion for the trial court. "The trial court has broad discretion to determine the admissibility of evidence at trial, and this court will not disturb its ruling absent an abuse of discretion."[12]
 {¶ 49} Likewise, this court does not perceive that an abuse of discretion was committed by the trial court in the admission of such evidence. As stated by the trial court, such evidence was relevant to the tortious interference with a contract claim.
 {¶ 50} The seventh assignment of error is without merit.
 {¶ 51} For the reasons stated herein, the judgment of the trial court is affirmed.
Grendell, J., Rice, J., concur.
[1] Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, paragraph one of the syllabus.
[2] Blosser v. Enderlin (1925), 113 Ohio St. 121, paragraph two of the syllabus.
[3] State v. Stallings, 150 Ohio App.3d 5, 2002-Ohio-5942, at ¶ 16.
[4] Blosser v. Enderlin, supra, paragraph one of the syllabus.
[5] Ohio Urology, Inc. v. Poll (1991), 72 Ohio App.3d 446, 452-453;Westco Group, Inc. v. City Mattress (Aug. 15, 1991), 2d Dist. No. 12619, 1991 Ohio App. LEXIS 3878, at *9.
[6] C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus.
[7] Gahanna v. Eastgate Properties, Inc. (1988), 36 Ohio St.3d 65, syllabus.
[8] (Citation omitted.) Burlington Group, Inc. v. Chardon Lakes InnRestaurant, Inc. (Mar. 24, 1995), 11th Dist. No. 94-G-1839, 1995 Ohio App. LEXIS 1099, at *10.
[9] (Citation omitted.) Id. at *8.
[10] Fred Siegel Co., L.P.A. v. Arter Hadden (1999),85 Ohio St.3d 171, paragraph one of the syllabus.
[11] Id. at paragraph three of the syllabus.
[12] Dungan v. Poynter (July 28, 1997), 12th Dist. No. CA96-09-016, 1997 Ohio App. LEXIS 3349, at *3.